# UNITED STATES *v.* FLEISCHMAN.

No. 98.   Argued December 15, 1949.—Decided May 8, 1950.

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General Campbell, Robert S. Erdahl, Philip R. Monahan* and *Felicia H. Dubrovsky.*

*O. John Rogge* and *Benedict Wolf* argued the cause and filed a brief for respondent.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

Respondent Fleischman is a member of the executive board of an organization known as the Joint Anti-Fascist Refugee Committee (hereinafter referred to as the asso-

ciation), which, during 1945 and 1946, was under investigation by the House Committee on Un-American Activities. In furtherance of its investigation, the Committee issued subpoenas on March 29, 1946, to each of the members of the executive board and to Helen R. Bryan, the executive secretary of the association, demanding that they produce certain of the association's records in the Committee's chamber on April 4, 1946. Fleischman and the other members of the board appeared on that date in response to the subpoenas but did not produce the records. The Committee thereupon reported to the House that the members of the executive board were in contempt of that body. After debate, the House voted to direct the Speaker to certify the Committee's report to the United States District Attorney for legal action.

Respondent and the other members of the executive board were jointly indicted for wilful default under R. S. § 102,[1] but Fleischman was tried separately from the others. Her defense, like that of Bryan,[2] consisted in part in the contention that she could not be guilty of wilful default because a quorum of the Committee had not been present when she appeared in response to the subpoena. The trial court withdrew that issue from the jury, holding "as a matter of law, that the Committee

---

[1] 11 Stat. 155, as amended, R. S. § 102, 2 U. S. C. § 192:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

[2] See *United States* v. *Bryan, ante,* p. 323.

on Un-American Activities of the House of Representatives was a validly constituted committee of Congress, and was at the time of the defendant's appearance." The Court of Appeals for the District of Columbia reversed, one judge dissenting, 84 U. S. App. D. C. 388, 174 F. 2d 519, on the ground that presence of a quorum of the Committee at the time of respondent's appearance was a material question of fact for the jury. The court also divided on the question of whether there was sufficient evidence to support the conviction, a majority holding the evidence sufficient. We granted a writ of certiorari, 338 U. S. 846, to consider these important questions arising under R. S. § 102.

The quorum question is governed by our decision this day in *United States* v. *Bryan, ante,* p. 323. Like Bryan, respondent testified before the Committee on the return day of the subpoena without making any suggestion of lack of a quorum. That issue was raised for the first time at the trial, two years after her appearance before the Committee, where she had given other reasons for her failure to produce the documents. Under the circumstances disclosed by this record, we think the defense of lack of quorum was not available to her.

The question of the admissibility of her testimony before the House Committee at her trial for wilful default is likewise governed by our decision in the *Bryan* case, where we held that R. S. § 859, 18 U. S. C. § 3486, cannot be read to prevent the introduction of testimony of this kind at a trial for wilful default under R. S. § 102.

There remains the question of the sufficiency of the evidence to support the verdict of guilt in this case. That evidence consisted in part of the record of the Committee's unsuccessful efforts over a period of four months to obtain the books and papers of the association from its chairman and executive secretary, of which there is

evidence of respondent's knowledge.[3]　Other evidence introduced may reasonably be taken to establish the following facts: Following its unsuccessful attempts to obtain the records from the chairman and executive secretary, the Committee issued subpoenas to all sixteen members of the executive board of the association, commanding them to appear on April 4, 1946, in the Committee's chamber, there to produce the records.　The subpoena served on respondent was addressed to her as "a member of the Executive Board of the Joint Anti-Fascist Refugee Committee."[4]　The board had power, its

[3] This evidence consisted of a resolution passed by the executive board on December 14, 1945, condemning the Committee's investigation and directing Miss Bryan to consult with an attorney with a view toward protecting the records from the Committee, and the minutes of a meeting of February 11, 1946, at which the executive board voted to instruct Dr. Barsky not to produce the records before the Committee, as he had been ordered to do.　While respondent did not participate in either of these actions, her knowledge of the Committee's efforts to obtain the records and the board's previous actions with respect thereto was shown by evidence of her attendance of a board meeting in March, 1946, when Dr. Barsky reported concerning his appearance before the Committee on February 13, and the association's attorney was present and talked to the board about its legal position in the matter.

[4] The subpoena served on Mrs. Fleischman read as follows:

"BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

"To the Sergeant at Arms, or his Special Messenger:

"You are hereby commanded to summon Mrs. Ernestina G. Fleischman, 'Voice of Fighting Spain', 1 Columbus Avenue, New York City, a member of the Executive Board of the Joint Anti-Fascist Refugee Committee to be and appear before the Un-American Activities Committee of the House of Representatives of the United States, of which the Hon. John S. Wood is chairman, and to bring with you all books, ledgers, records and papers relating to the receipt and disbursement of money by or on account of the Joint Anti-Fascist Refugee Committee or any subsidiary or sub-committee thereof, together with all correspondence and memoranda of com-

members acting jointly, to direct Miss Bryan to produce the records, to transfer custody of the documents to some other person, or to remove her from office.[5] But during the interval between March 29, when the subpoenas were

munications by any means whatsoever with persons in foreign countries. The said books, papers and records demanded herein are for the period from January 1, 1945 up to and including the date of this subpoena, in their chamber in the city of Washington, on April 4, 1946, at the hour of 10:00 A. M. then and there to testify touching matters of inquiry committed to said Committee; and [she] is not to depart without leave of said Committee.

"Herein fail not, and make return of this summons. . . ."

It is now suggested that this subpoena is defective because addressed not to the association by name but to respondent as a member of the executive board of the association, and *Wilson* v. *United States,* 221 U. S. 361 (1911) and *Commissioners* v. *Sellew,* 99 U. S. 624 (1879) are distinguished on that ground. We can think of no clearer way of notifying respondent that she was required to perform her duty as a member of the governing board of the association than to serve an individual subpoena upon her, addressed to her in her official capacity as a member of the executive board, and calling for the production of papers which she knew were under the control of the executive board. This subpoena makes explicit what is merely implicit in subpoenas addressed to an organization by name and served on individual directors, as was done in the *Wilson* case.

[5] Mrs. Fleischman's testimony concerning the powers and authority of the executive board was as follows:

"The CHAIRMAN. There isn't any other authority higher than the executive board?

"Mrs. FLEISCHMAN. No.

"The CHAIRMAN. And on all matters of policy, direction of the activities of the Joint Anti-Fascist Refugee Committee, the executive board is the highest authority?

"Mrs. FLEISCHMAN. Yes.

"The CHAIRMAN. Now, as a member of that board—you say you are a member now?

"Mrs. FLEISCHMAN. Yes.

"The CHAIRMAN. As a member of that board are you now willing, so far as you personally are concerned, as a member of that board are

issued, and April 4, when its members appeared before the Committee, no meeting of the executive board was held to discuss compliance. A number of members of the board met in an attorney's office in New York on April 2, when he gave to each a typewritten statement to read to the Committee.

All of the members who had been subpoenaed appeared at the time and place specified in the subpoenas. No one produced the records. Each of the sixteen members of the board, including respondent, read or handed to the Committee the identically worded statements prepared by the association's attorney. These statements read:

> "I individually do not have possession, custody, or control over any of the material requested in the subpena which was served upon me. The books, records, and correspondence of the Joint Anti-Fascist Refugee Committee are in the possession, custody, and control of Miss Helen R. Bryan, the executive secretary of our organization, and she is the legal custodian of this material. Since I do not have either in my possession, custody, or control the books, records, and documents described in the subpena, I am unable to comply with your order to produce them."

Upon being questioned by the Committee as to whether she, individually, would give her consent to production of the books, respondent's answer was that that question

---

you now willing to permit this committee of Congress to see those books and records called for in that subpena?

"Mrs. FLEISCHMAN. I don't know what I would do. *It would require a meeting of the board.*" (Emphasis supplied.)

There was also testimony that the board had power to transfer custody of the records from Bryan to some other person and that, in fact, the vote at the February 11 meeting had been on that very question.

was "not pertinent"; that she would decide only at a meeting of the board.

Respondent and the other members of the board were jointly indicted on a charge that they "appeared before the Congressional Committee in the City of Washington, District of Columbia, on April 4, 1946, but failed to produce the records called for in the subpoenas, as they had power to do, and thereby wilfully made default." As we have pointed out, there is evidence to support the charge that the records were under the joint control of the members of the executive board and that the individual members, acting together, had power to produce them. It is contended, however, that respondent (in this respect no different from any other member) had no *individual* control over the records, and that there is thus no evidence that the nonproduction of the records resulted from anything she personally did or omitted to do.

It seems elementary that the only manner by which a duty requiring the joint participation of several persons may be performed is by a combination of individual performances. And conversely, the failure to perform such a duty is the result of a failure by some or all of the persons who have been ordered to act together to discharge their responsibilities. This failure is not necessarily the result of a conspiracy, which premises an agreement of some kind. One may, either alone or in concert with others, fail to perform his individual part of a task requiring joint participation.

When one accepts an office of joint responsibility, whether on a board of directors of a corporation, the governing board of a municipality, or any other position in which compliance with lawful orders requires joint action by a responsible body of which he is a member, he necessarily assumes an individual responsibility to act,

within the limits of his power to do so, to bring about compliance with the order. It may be that the efforts of one member of the board will avail nothing. If he does all he can, he will not be punished because of the recalcitrance of others. *Commissioners* v. *Sellew,* 99 U. S. 624, 627 (1879). But to hold that, because compliance with an order directed to the directors of a corporation or other organization requires common action by several persons, no one of them is individually responsible for the failure of the organization to comply, is effectually to remove such organizations beyond the reach of legislative and judicial commands. This Court and the state courts which have considered the matter [6] have adopted a contrary view. In *Wilson* v. *United States,* 221 U. S. 361 (1911), Mr. Justice Hughes stated the proposition thus:

> "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance *or fail to take appropriate action within their power for the performance of the corporate duty,* they, no less than the corporation itself, are guilty of disobedience

---

[6] For applications of this principle in the analogous situation presented by noncompliance with a mandamus, see *State* v. *City of Live Oak,* 126 Fla. 132, 170 So. 608 (1936); *Littlefield* v. *Town of Adel,* 151 Ga. 684, 108 S. E. 56 (1921); *Smith* v. *Lott,* 156 Ga. 590, 119 S. E. 400 (1923); *McCulloch* v. *State,* 174 Ind. 525, 92 N. E. 543 (1910); *Middle States Utilities Co.* v. *City of Osceola,* 231 Iowa 462, 1 N. W. 2d 643 (1942); *Kentucky Culvert Mfg. Co.* v. *Elliott County Fiscal Court,* 239 Ky. 797, 40 S. W. 2d 375 (1931); *State* v. *Minneapolis Street R. Co.,* 154 Minn. 401, 191 N. W. 1004 (1923); *Heather* v. *City of Palmyra,* 317 Mo. 1320, 298 S. W. 750 (1927); *Commonwealth* v. *Schmidt,* 287 Pa. 150, 134 A. 478 (1926); *Butler County* v. *Pittsburgh, H., B. & N. C. R. Co.,* 298 Pa. 347, 148 A. 504 (1929).

and may be punished for contempt." *Id.* at 376. (Emphasis supplied.) See also *Commissioners* v. *Sellew, supra.*[7]

Nor is a distinction to be drawn on the ground that a corporation was there involved while the Joint Anti-Fascist Refugee Committee is an unincorporated association. *Brown* v. *United States,* 276 U. S. 134, 141–142 (1928), makes it clear that a subpoena directed to an unincorporated association and its officers is equally valid. If the legislative committee had a right to demand the records, the directing officers of the association are quite as responsible for their production as if they were corporate officers. Cf. *United States* v. *White,* 322 U. S. 694 (1944).[8]

The question that remains is whether, after introducing evidence that the board had power to produce the records, that it had not done so, and that each member of the board had read the identical statements quoted above

---

[7] It is suggested that the *Wilson* case is distinguishable because it may be inferred from the fact that, according to Government counsel, the Government had been after the records "in one way or another" for nearly a month that the subpoenas *duces tecum* served upon the directors had been supplemented by oral orders. There is not one word in the *Wilson* record that supports such an inference. On the contrary, the grand jury's presentment was not for failure to obey any oral commands but "for failure to obey a certain subpoena issued out of this Court, dated October 28, 1910." *Vide* the following:

"The COURT: What is the presentment precisely?

"Mr. WISE [Government Counsel]: The Grand Jury presents that the corporation is in contempt of this court in not obeying the subpoena, that these gentlemen are in contempt of Court in that they have known and had actual notice of .the subpoenas issued to the corporation requiring it to produce these books, and in defiance of this court and of its process have failed to take any action to have their corporation comply with the process, . . . ."

[8] The argument that respondent was tried and convicted upon a theory different from that upon which the evidence is here found sufficient to sustain the conviction is refuted by the record, which

as his reason for noncompliance, the Government has the further burden of proving that each individual member had not done that which was within his power to bring about compliance with the Committee's order. It may well be that respondent's prepared statement before the Committee and her answers to the Committee's questions are sufficient in themselves to satisfy that requirement. For they indicate clearly that respondent had assumed no personal duty to do anything. The prepared statement was, of course, a patent evasion of the Committee's demands. While stating that each member of the executive board *individually* did not have control over the records, it does not deny, as it could not, that the members had power *jointly* to comply with the subpoenas. Since the subpoenas required that they act jointly—the previous demands on the chairman and the executive secretary individually having been of no avail—the statement that the members *individually* had no power to comply is completely irrelevant.

And when the Committee asked respondent whether she, personally, would permit the Committee to have

is full of discussion concerning the import of the *Wilson* case. The following is representative:

"MR. ROGGE [counsel for respondent]: . . . Let's look at the Wilson case again, which the Court of Appeals passed on [in *Barsky* v. *United States*, 167 F. 2d 241, 251]. It says if your members have the right to direct the corporation and fail to take appropriate action; in order to be free of guilt here did Ernestina have to be a propagandist and go to the board members and say before taking action—

"THE COURT (interposing): When she takes on the responsibility of an executive board member certain responsibilities flow along with that when she does it.

"MR. ROGGE: She is a member of the executive board. The evidence has shown that. . . . The record also shows that, what you get down to is that Ernestina, in order not to be guilty here, had to see to it that some sort of an affirmative action was taken, and I do not think that is required even under the Wilson case."

access to the books, her answer again was an evasion. She said: "I don't think it is pertinent to say what I should do a week from now."

The difficulty with that position is that it is not for her nor any other member of the board to say that she would make up her mind next week. The return day of the subpoena had arrived. No one so much as hinted that there had been no time to act. The members had gathered in an attorney's office on April 2, when they received their statements. There was evidence that some members had gathered informally elsewhere to discuss the question of compliance. In fact all were present in the anteroom of the Committee's chamber on the morning of April 4. If there had been the slightest bent toward compliance, the opportunities were there. When respondent appeared before the Committee, she was asked in effect, as of that time, whether she was a party to the joint refusal to produce the records: "Would you now, right here now, give your consent to this committee to [see the books and records]?" As one of the members of the Committee stated to respondent: "That is the main thing, the whole case." Her answer was no answer.

It may be argued, however, that respondent may have adopted the position of the other members of the board only after she had tried in good faith to bring about compliance with the subpoena. Or perhaps she had been ill or necessarily out of town immediately prior to April 4. Granting that these or other excuses for nonaction may exist, must the Government negative each, or was the burden on respondent to advance them as defensive matter?

We think that the circumstances of this case fairly bring into play the familiar doctrine in criminal cases that "it is not incumbent on the prosecution to adduce positive evidence to support a negative averment the truth of which is fairly indicated by established circum-

stances and which if untrue could be readily disproved by the production of documents or other evidence probably within the defendant's possession or control." *Rossi* v. *United States,* 289 U. S. 89, 91–92 (1933), and authorities cited. The considerations that govern this question have been well stated by Mr. Justice Cardozo in discussing a similar question—the constitutionality of a statute which shifted the burden of proof in a criminal prosecution to the defendant. He said:

> "The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression.
>
> .    .    .    .    .
>
> ". . . For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister significance . . . , or if this at times be lacking, there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception. Greenleaf, Evidence, Vol. 1, § 79.* The

---

*The Court's footnote reads: "Instances of the application of this principle can be cited in profusion. The cases that follow are typical examples: *King* v. *Turner,* 5 Mau. & Sel. 206, where a defendant having game in his possession in violation of a statute whereby possession was generally a crime, was held to have the burden of

list is not exhaustive. Other instances may have arisen or may develop in the future where the balance of convenience can be redressed without oppression to the defendant through the same procedural expedient. The decisive considerations are too variable, too much distinctions of degree, too dependent in last analysis upon a common sense estimate of fairness or of facilities of proof, to be crowded into a formula. One can do no more than adumbrate them; sharper definition must await the specific case as it arises." *Morrison* v. *California*, 291 U. S. 82, 88–91 (1934).[9]

In this situation, manifestly, the prosecution is under a serious practical handicap if it must prove the negative proposition—that respondent did not or had no good reason for failing to try to comply with the subpoena insofar as she was able. The possibilities of time and

---

proving his special qualifications (cf. *Yee Hem* v. *United States,* [268 U. S. 178]; also *Spieres* v. *Parker,* 1 T. R. 144, per Lord Mansfield); *Fleming* v. *People,* 27 N. Y. 329, a prosecution for bigamy, where on proof that the defendant had contracted a second marriage during the lifetime of his first wife, the burden was laid upon him to prove exceptional circumstances that would have made the marriage lawful; and finally such cases as *Potter* v. *Deyo,* 19 Wend. 361, 363, and *United States* v. *Turner,* 266 Fed. 248 (typical of a host of others) where a defendant has been subjected to the burden of producing a license or a permit for a business or profession that would otherwise be illegal. Cf. *United States* v. *Hayward,* 26 Fed. Cas. 240; *Board of Comm'rs* v. *Merchant,* 103 N. Y. 143; 8 N. E. 484."

[9] See also *Williams* v. *United States,* 78 U. S. App. D. C. 147, 138 F. 2d 81 (1943). In *Tot* v. *United States,* 319 U. S. 463 (1943), this Court refused to uphold a federal statute creating a presumption that firearms found in the possession of one who has previously been convicted of a crime of violence were received by him in interstate or foreign commerce after July 30, 1938, on the ground that the presumption is "inconsistent with any argument drawn from experience." *Id.* at 468.

circumstance are of such wide range as to defy inclusive rebuttal. On the other hand, the burden of the affirmative was not an oppressive one for respondent to undertake; the relevant facts are peculiarly within her knowledge. She was called upon merely to introduce evidence as to what steps she took after receiving the subpoena, or, if she took no action, any evidence tending to excuse her omission. Respondent does not lose the presumption of innocence that surrounds the defendant in a criminal prosecution. That presumption continues to operate until overcome by proof of guilt beyond a reasonable doubt and is not to be confused with burden of proof, which is a rule affecting merely the time and manner of proof. See 1 Wharton, Criminal Evidence (11th ed.) §§ 199–204.[10]

---

[10] This conclusion is buttressed by the fact that such a burden ordinarily is cast upon members of the governing boards of corporations and associations which have not complied with court orders, when they are brought into court on contempt charges. In *Wilson* v. *United States*, 221 U. S. 361 (1911), where Wilson, the president of the corporation, had custody of the books and had removed them to his home, the corporation and five of its directors were served with subpoenas to produce. The directors appeared in court and were not held in contempt although they did not produce the books because, as this Court noted in its opinion: "On behalf of the directors before the court it was stated that they had made efforts to obtain the books for production before the grand jury, but that Wilson had declined to surrender them. They presented the minutes of a meeting of the board of directors held on that day at which these directors [*i. e.* those who had been served with subpoenas], constituting a majority of the board, had passed a resolution demanding of Wilson the possession of the letter press copy books called for by the subpoena 'for the production of the same before the Federal Grand Jury.'" *Id.* at 371. Again, in contrasting Wilson's actions with those of the directors, the Court stated: "The appellant did not attempt to assert any right on [the corporation's] part; his conduct was in antagonism to the corporation, so far as its attitude is shown. A majority of the directors, not including the appellant,

Even though we assume, therefore, contrary to the reasonable inferences to be drawn from respondent's statements before the Committee, that she may have made some effort to bring about compliance with the subpoena, or had some excuse for failing to do so, we think that under the circumstances here presented the burden was upon her to present evidence to sustain such a defense. And, in the absence of such evidence, we conclude that the evidence adduced by the Government amply sustains the conviction. Respondent is no more or less guilty than any other member of the board. If she can escape prosecution by remaining quiescent, so can all the others. If hers is a valid defense, then all that the directors of a corporation need do when they and the corporation are served with subpoenas is to refrain from discussing compliance with the order. No one need make any attempt to comply, for none of them "individually" has control over the action—or nonaction—of the corporation. A stratagem so transparent does not cast a shadow of substance.[11]

---

appeared before the court and urged their solicitude to comply with the writ. They presented their formal action, taken at a meeting of the board, in which they demanded of the appellant the delivery of the books for production before the grand jury." *Id.* at 376. In considering this practice it should be noted that in criminal contempts, as in criminal cases, the presumption of innocence obtains; proof of guilt must be beyond a reasonable doubt; and the defendant may not be compelled to be a witness against himself. *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 444 (1911); *United States* v. *Goldman*, 277 U. S. 229, 235–236 (1928); *Michaelson* v. *United States*, 266 U. S. 42, 67 (1924).

[11] The proposition that one who tries but fails to obtain compliance with a subpoena requiring the joint action of several persons has made a useless and "empty gesture" which should not be compelled by the courts overlooks the fact that if enough members of the governing body make the attempt required by the subpoenas their joint effort will ordinarily be successful. In the *Wilson* case itself

It should be emphasized that we are not dealing with the duties of witnesses summoned by one committee but with the obligations owed by persons summoned by authority of the Senate or House of Representatives to appear before any person or group designated by that authority. Reforms in the practices and procedures of certain committees are vigorously demanded by persons both within and without Congress. We would not be understood in this case as expressing either approval or disapproval of those practices. But the remedy, if any is needed, is certainly not to destroy the effective operation of all committees, which is the necessary result if they cannot compel the disclosure of facts. A subpoena is a sterile document if its orders may be flouted with impunity.

Respondent advances a number of contentions which were not passed upon by the Court of Appeals. We do not decide them at this time. The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE FRANK-FURTER concurs, dissenting.

The Court holds that there is sufficient evidence in this record to support the conviction of respondent Fleischman under R. S. § 102. I cannot agree. Whether the evidence is sufficient depends primarily on what conduct is made criminal by R. S. § 102 and what action is re-

---

the difference between imprisonment of the directors for contempt and their acquittal was their "empty gesture" of calling upon Wilson to produce the records. See note 10, *supra.*

quired by a subpoena *duces tecum*. My views on these questions differ so drastically from those of the Court that I shall present them, and the conclusions which they dictate, before turning to the Court's opinion.

## I.

R. S. § 102 provides: "Every person who having been summoned as a witness by the authority of either House of Congress, to give testimony or to produce papers . . . willfully makes default, . . . shall be deemed guilty of a misdemeanor . . . ." This criminal statute is limited by its terms to just two types of congressional orders: (1) a subpoena to give testimony, and (2) a subpoena to produce papers. The latter type of order is involved here.

Refusal to comply with a subpoena to produce papers can be punished only if the witness has power to produce. It is a complete defense for him to show that the papers are not in his possession or under his control. For a subpoena *duces tecum* does not require a witness "to sue and labor in order to obtain the possession of any instrument from another for the purpose of its production afterwards by himself . . . ." *Munroe* v. *United States,* 216 F. 107, 111–112, quoting Lord Ellenborough's opinion in *Amey* v. *Long,* 9 East 473, 483; see the general discussion in Notes, 1915B L. R. A. 980–985; 32 Am. St. Rep. 648. A command to produce is not a command to get others to produce or assist in producing. Of course Congress, like a court, has broad powers to supplement its subpoena with other commands requiring the witness to take specific affirmative steps reasonably calculated to remove obstacles to production. But even though disobedience of such supplementary orders can be punished at the bar of Congress as contempt, *Jurney* v. *MacCracken,* 294 U. S. 125, it does not come within the limited scope of R. S. § 102. Only by importing the broad contempt powers of Congress into this criminal statute can this Court say that

it does. I cannot agree to such cavalier expansion of any criminal provision.

Prosecution under R. S. § 102 is thus limited to a range far narrower than is a proceeding for contempt, either in court or at the bar of Congress. And even under the notoriously broad contempt power, punishment is justifiable only when a person has failed to comply with an order specifying precisely what he must do, and when he has power himself to do what is ordered.[1] Certainly no less precise standard should be established in prosecutions for violation of a criminal statute. *Cf. Pierce* v. *United States,* 314 U. S. 306, 310–311.

Viewed in this light, the evidence in this case unmistakably falls short of proving that Fleischman disobeyed the subpoena or violated the statute. The Government did succeed in establishing that she had received the subpoena, knew approximately what documents she was required to produce, and yet failed to produce them. But an essential ingredient of the offense—that she had *power* to produce those records on April 4—remains completely unsubstantiated.[2] The Government does not contend that Fleischman had power to produce except by acting jointly with other members of the board. And, for the reasons stated above, the subpoena addressed to Fleischman as an individual board member imposed on her no duty to prod others to produce, or to initiate joint action aimed at production.[3]

---

[1] The two components of this general principle and their application to this case are discussed in II (A) and II (D) *infra.*

[2] The Court's attempt to offset this deficiency is discussed in II (D) *infra.*

[3] Whether joint action would have been required by a subpoena addressed to the board is completely irrelevant for the reasons set out in note 4 *infra.* It should be noted, however, that an order to the board as an entity necessarily implies joint action; one addressed to an individual member does not. Moreover, the former is sufficiently

Because of the limited scope of R. S. § 102 and the complete absence of proof that Fleischman had power to produce the subpoenaed documents, her conviction of the crime created by that statute should be set aside.

## II.

The Court does not dispute that the evidence is insufficient to uphold Fleischman's conviction under the established principles outlined above. Rather it constructs a novel legal theory which, however plausible on the surface, will not stand detailed analysis.

The chain of reasoning on which its legal theory hangs appears to be this: Fleischman and other members of the executive board were served with separate subpoenas ordering each to produce papers of the association on April 4; Bryan, the executive secretary, had possession of the papers; the individual subpoenas imposed on each board member a personal duty to do all each could to bring about joint action that would cause production; had Fleischman performed her individual part of this joint task, she might have prevailed on the board to pass a resolution which might have forced Bryan to produce; Fleischman failed to show that she had done all she could to bring about that result; therefore Fleischman was properly convicted of the crime of wilfully disobeying the subpoena addressed to her as an individual member of the board.

In this intricate chain, certain crucial links are entirely missing and others are far too weak to sustain a criminal conviction:

A. The foundation of the Court's theory is that a subpoena *duces tecum* addressed to an individual board mem-

---

specific if it tells the *board* exactly what to do; the latter must tell the *individual* what to do. In either case, the recipient must have power to do what is ordered before punishment is justified.

ber includes the command that he do "all he can" to bring about joint board action to produce the subpoenaed papers.[4] This doctrine expands the scope of the subpoena *duces tecum* far beyond its traditional boundaries, which are outlined in Part I *supra*. No precedent for such an expansion can be found in the two cases relied on by the Court.

*Commissioners* v. *Sellew*, 99 U. S. 624, merely approved issuance of a writ of mandamus to a county commission ordering specific action on a specific date as specifically required by Kansas statutes. Such is the traditional function of mandamus. Seldom has a judicial order been more explicit. In sharp contrast to Fleischman, the commissioners were not required to hazard the least guess as to what action would satisfy the judicial mandate. Both that mandate and the applicable state statutes told them precisely what to do.[5]

Nor does the opinion in *Wilson* v. *United States*, 221 U. S. 361, support today's holding that an order to produce papers requires a person, without further orders, to take action getting others to produce. The Court relies on a dictum that corporate officials can be required to take "appropriate action" to secure performance of a corporate duty. Even the dictum, however, must be read in the context of that case. Wilson, the president of a corporation to which a subpoena was addressed, had actual custody of the subpoenaed records. Appearing before the grand jury with several corporation directors, he re-

---

[4] While a subpoena was also addressed to the board as an entity, there is utterly no evidence that Fleischman ever knew of it. Therefore, like the Court, we treat the case as if no board subpoena had ever been issued.

[5] The string of mandamus cases cited in note 6 of the Court's opinion are equally inapplicable for the same general reason. No case cited supports the Court's position.

fused to produce. The directors denied power to make him do so. In the resulting contempt proceedings, the prosecuting attorney complained that the Government had been after the records "in one way or another before this same Grand Jury for nearly a month." He emphasized that many of the directors had frequently appeared before the grand jury, and indeed had spent the entire preceding day there.[6] In view of the frequent and prolonged appearances of the directors before the grand jury, even a passing acquaintance with how a grand jury operates would make it inconceivable that "one way or another" did not include oral orders to take action aimed at forcing Wilson to turn over the records. Whether such orders were specific enough to justify holding the directors in contempt, or whether failure to take any action would justify punishment for violation of the subpoena itself without first ordering the directors to take specific steps, became immaterial when the directors passed a resolution ordering Wilson to produce. The directors were found innocent, and the only issues before this Court involved Wilson's guilt. Read in this context, the dictum on which the Court relies affords no support whatever for its conclusion here that a subpoena, of itself, imposes the amorphous duty of "appropriate action" to get others to produce. Moreover, citation of the *Sellew* case as authority for the dictum clearly indicates that the "appropriate action" would have to be designated and commanded by specific orders. Nothing in the *Wilson* opinion can fairly be interpreted as supplanting, or even casting doubt on, the traditional rule that failure to take action required by an order can be punished only

---

[6] It should be noted that the directors appeared in response to a subpoena addressed to the corporation. Unlike Fleischman, they were not subpoenaed individually. See note 3 *supra*.

if the action is clearly, specifically, and unequivocally commanded by that order.[7]

Apparently the only reason given for discarding this rule is the Court's statement that failure to construe an individual subpoena as requiring joint action by members of a board would "remove such organizations beyond the reach of legislative and judicial commands." That fear is without foundation. A custodian wilfully failing to produce records can be prosecuted under R. S. § 102. And under 18 U. S. C. § 3, anyone "aiding or abetting" her also becomes a principal in that offense and is similarly subject to R. S. § 102. Moreover, a conspiracy to prevent production would certainly provide grounds for conviction. Thus there is no question that Fleischman's conviction could be sustained if there had been sufficient evidence that she actually aided or encouraged the custodian's refusal to produce, or conspired to accomplish that result.[8] And in the rare instance where these sanc-

---

[7] See, e. g., McFarland v. United States, 295 F. 648, 650: "Certainly before one may be punished for contempt for violating a court order, the terms of such order should be clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed." See also Berry v. Midtown Service Corp., 104 F. 2d 107, 111, 122 A. L. R. 1341, and Labor Board v. New York Merchandise Co., 134 F. 2d 949, 952. In the latter case the court, in an opinion by Judge Learned Hand, characterizes as "cardinal" the rule that "no one shall be punished for the disobedience of an order which does not definitely prescribe what he is to do." For application of the same general rule to contempt proceedings for enforcement of a court decree, see Terminal R. Assn. v. United States, 266 U. S. 17, 29.

[8] One count of the indictment actually charged Fleischman and other members of the board with conspiracy. That count was dismissed. As for Fleischman's guilt as an "aider and abettor," that question was submitted to the jury by the trial judge's charge. In affirming, this Court does not even suggest that there was evidence to show that Fleischman had ever aided or encouraged Bryan or

tions seem unlikely to secure compliance, Congress can always fall back upon its arsenal of supplementary orders enforced by congressional contempt proceedings: [9] officers with authority to call a board meeting can be ordered to do so, and board members can be ordered to vote for resolutions calculated to foster production. It can be safely presumed that any organization capable of escaping this barrage would not be brought into line by today's expansion of R. S. § 102. A subpoena is not made "sterile" by holding that it commands only what it says it commands.

In fact, the Court's new doctrine creates a danger far more genuine than what it allegedly avoids. While in contempt proceedings a witness in doubt as to just what action is demanded can be given more precise orders before a tribunal decides to punish him for noncompliance, no such flexibility exists in criminal prosecutions under R. S. § 102. As applied to such prosecutions, the sweeping requirement that a witness not having custody or control of subpoenaed documents must do "all he can" to secure their production places him in an unfair dilemma. Caution dictates that he "sue and labor" to obtain the papers, however great and however useless the effort and expense. On the other hand, common sense counsels that he make such practical efforts as would satisfy a reasonable jury—and not until the jury has spoken will he know whether he guessed right.

Not even after today's opinion can Fleischman—or, for that matter, anyone else—know precisely what steps were

---

anyone else. That Fleischman's conviction cannot be upheld under existing doctrines does not establish the inadequacy of those doctrines for any purpose except convicting one whose guilt as charged has not been proven.

[9] See Part I *supra*.

required of her to encourage production of documents which she herself could not produce.[10]

B. Even if the theory on which this Court upholds Fleischman's conviction were tenable, it is, as might be expected from its novelty, completely different from the theory on which the case was tried. An essential element in the trial judge's charge was his instruction that the jury could find Fleischman guilty only if it found that she had "acted in concert with other members of the executive board" to prevent production. But the Court, without even attempting to support her conviction on this theory, substitutes a theory involving completely different problems of proof and evidence.[11] The issue of whether Fleischman had failed to attempt to persuade others to produce was not being tried, and there was no reason for her to introduce evidence concerning it. The question on review is not whether the record as a whole exudes a general impression of guilt, but whether the evidence supports a finding of guilt on the issues presented to the jury by the trial judge's charge. *Bollenbach* v. *United States,* 326 U. S. 607, 614. This Court should heed its mandates forbidding state appellate courts to uphold convictions on any theory materially different from that on which the case was presented to the jury. See *Cole* v. *Arkansas,* 333 U. S. 196, 201–202.

---

[10] There is not the slightest indication that anything Fleischman could have done even had a prospect of fostering compliance with the subpoena. See II (D) *infra.* Apparently Fleischman's conviction is being upheld because she failed to make some undefined empty gesture.

[11] The Court attempts to justify its change of theories by quoting from a bench argument between Fleischman's attorney and the trial judge. Such an argument cannot alter the theory on which the case was submitted to the jury by the judge's charge.

C. The Court relies heavily on statements made by Fleischman before the congressional committee. But these statements are expressly made inadmissible by 18 U. S. C. § 3486, which provides that no testimony given by a witness before any committee of either house "shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony." See *United States* v. *Bryan, ante,* pp. 323, 346.

Nor does Fleischman's testimony, even if admissible, support the inferences drawn from it by this Court. Weighty significance is attached to her refusal to say how she would vote on the question of production if a board meeting were held. Suffice it to say that no meeting had been held following her receipt of the subpoena, no future meeting had any relevance whatever to the past offense with which she was charged, and the subpoena did not order her to take action at a board meeting anyway. See Part I *supra.*

Equally unwarranted is the inference drawn by the Court from the fact that Fleischman and other board members read the same statement denying individual possession or control over the subpoenaed documents. The Court refers to this statement, prepared by a lawyer, as a "patent evasion" of the committee's order. On the contrary, I regard the denial of individual power to produce as a complete and adequate response to the individual subpoenas. And surely, although the Committee would not permit counsel for witnesses to enter the committee room, witnesses have always been entitled to get advice from a qualified lawyer and present a statement prepared by him without having inferences of guilt drawn from that fact.

D. Power to produce is an essential ingredient of any offense under R. S. § 102, and the indictment necessarily

alleged that "each and all" of the board members had such power. Thus proof of Fleischman's power to produce the subpoenaed papers is undeniably vital to the Court's theory of the case.

The only evidence tending to show power in the board itself to produce is that it had authority over the policies and activities of the association, and had power to suspend Bryan at any regular board meeting.[12] Assuming that the board could have ordered Bryan to produce under threat of suspension, the *Wilson* case demonstrates that prospective obedience to such a potential board order cannot accurately be inferred merely from the supremacy of a board. And this record is barren of any evidence to support a finding that Bryan would have complied on April 4th with a board order.

Equally important under the Court's theory is the question of Fleischman's own power to bring about production. The Court holds that membership on the board gave her one-eighteenth of the board's official "power," which it considers enough to support conviction. But her fraction of official "power" could be exercised only at an official meeting. There is no showing that any meeting was held between March 29 and April 4, or that Fleischman had power to call such a meeting.[13] And I do not understand

---

[12] Even this evidence comes primarily from Fleischman's testimony before the congressional committee, and should therefore be held inadmissible. See *United States* v. *Bryan, ante,* pp. 323, 346.

[13] The Court intimates that Fleischman could have called a meeting when members of the board were gathered in an attorney's office on April 2d, or an informal gathering of members elsewhere. It should be noted that the prosecutor labored valiantly at the trial to establish that Fleischman visited the attorney's office or attended some informal meeting. He failed completely in this effort. Despite repeated questions to several witnesses, not one response was evoked indicating that Fleischman ever saw or communicated with a single board member during the interval between the time she was subpoenaed and the time the members met in the anteroom of the

the Court to say that the "power to produce" which Fleischman criminally failed to exercise was solely some imagined personal ability, unconnected with her official capacity, to attempt to cajole the chairman into calling a meeting or ordering production.

Upon a showing merely that the board controlled the "policies and activities" of the association and that she was a board member, the Court imposes on Fleischman the burden of disproving the crucial allegation of "power to produce" by establishing that she had done "all she could" to bring about production. In effect it has set up a presumption that every board member automatically has such power, and has saddled Fleischman with the burden of proving her innocence by showing that the presumption should not apply to her.[14] In the absence of some showing that she had authority to call or an opportunity to vote at an official board meeting, or at least had substantial influence over other board members, this is every bit as arbitrary as the presumption rejected in *Tot* v.

Committee. As for the suggestion that Fleischman might have called a meeting in the anteroom of the Committee's chambers, it is strange doctrine to assert that the Committee's command that all members appear was enough to require automatically that each member call a meeting. If that was what the Committee wanted, it could have ordered a meeting itself.

In any event, "opportunity" to call a meeting cannot be equated with official "power" to call a meeting. There is no evidence even intimating that she had such authority.

[14] This theory sharply contrasts with the established principle that corporate and association officials, like other persons, can be held guilty only for their own crime, and not for the crimes of their associates in which there is no proof that they participated. Any contrary doctrine is a startling innovation in the laws of this country. See *Brotherhood of Carpenters* v. *United States*, 330 U. S. 395, 406–407. See also cases collected in Notes, 33 A. L. R. 787; 16 L. R. A. (N. S.) 333; 8 Ann. Cas. 383.

*United States,* 319 U. S. 463.[15]  That case directly bars use of such a device to shift the burden of proof, however convenient it would be for the prosecutor.  And without that device, the Government's case was clearly insufficient to support the verdict.

The time-honored rule, that the Government is required to prove every essential ingredient of an offense it charges, provides a safeguard essential to preservation of individual liberty against governmental oppression.  It should not be sacrificed in order to sustain the conviction of a single defendant whose guilt the Government has plainly failed to prove.

*    *    *    *    *

If the Court's theory merely had any one of the above flaws, its chain of reasoning would break.  With all four, it collapses.  The judgment of the Court of Appeals should be affirmed.

MR. JUSTICE FRANKFURTER, dissenting.

Anyone who "willfully makes default" in obeying a valid subpoena to produce records before a committee of Congress has, ever since 1857, been guilty of a federal

---

[15] See note 9 of the Court's opinion.

Under the *Tot* rule, the minimum justification for such a presumption would be general experience that the most insignificant member of a board has power, if she "does all she can," to secure board production of documents held by its custodian.  Experience not only fails to support this premise; as anyone familiar with the loose-jointed structure of nonprofit associations should know, most members or most boards are wholly subordinate to the executive secretary and the chairman.  This is one of the "many significant respects" in which such associations obviously differ from business corporations.  See *United States* v. *White,* 322 U. S. 694, 697.  Not a single line in *Rossi* v. *United States,* 289 U. S. 89, or *Morrison* v. *California,* 291 U. S. 82, supports the "presumption" retroactively created here.  As a basis of "power to produce," mere board membership is no substitute for possession, custody or control.

offense. Act of January 24, 1857, 11 Stat. 155, R. S. § 102, as amended by Joint Resolution of June 22, 1938, 52 Stat. 942, now 2 U. S. C. § 192. This was the offense for which respondent was prosecuted. The trial court thus put to the jury the theory of the prosecution:

> "If you find that the members of the executive board, directly or indirectly, had custody or dominion and control over the records subpoenaed and could have produced the records called for, but wilfully failed and refused to do so, and that the defendant Fleischman acted in concert with other members of the executive board, either throughout or at any point, to prevent the committee from getting the subpoenaed records, then you may find the defendant Fleischman guilty, if you find that the other elements hereinafter set out have been proved by the United States beyond a reasonable doubt."

The only "other element" that bears on the issue of the sufficiency of the evidence was the court's explanation that the requirement that the default be made "willfully" means that the default must be "deliberate and intentional."

The indictment against respondent also had a count charging her and others with conspiring to make willful default of congressional subpoenas. It is inappropriate to consider whether the evidence would have been sufficient to bring respondent within the expansive range of a conspiracy charge or whether evidence that could have been admitted under such a charge but was not admissible in this trial would have sufficed to prove guilt. For its own good reasons the Government dismissed the conspiracy charge against Fleischman. A careful study of the record compels the conclusion that Edgerton, J. conveyed fairly and in balance all that the Government

proved against respondent on the charge on which she was tried:

> "Appellant testified without contradiction that she could not produce the records because they were not in her possession or control. She refused to express either willingness or unwillingness that they be produced.[8] Even this refusal did not occur until she was questioned by members of the Congressional Committee on April 4. The records were in possession of one Bryan, subject to control by an Executive Board of about 18 members of whom appellant was one. Long before April 4 Bryan, directed by other members of the Board but not by the appellant, had determined not to produce the records. There is no evidence that appellant ratified or approved the action of the other members of the Board. The government says 'In taking part in a combined action to withhold records from a Congressional Committee the appellant acted at her own peril.' But I have not been able to find any evidence, and no evidence has been pointed out, that the appel-

---

"[8] 'The Chairman: Mrs. Fleischman; I am going to ask you now for your personal permission. I am requesting you personally to permit this committee of Congress to have access to those books. Will you give it to us or not? So far as you are able to do, will you give it to us?

" 'Mrs. Fleischman: That is expressing my opinion, Mr. Chairman. I cannot say what the board will do.

" 'The Chairman: I am not asking what the board will do. I am asking what you will do.

" 'Mrs. Fleischman: I do not know, because the thing comes to the board to discuss, and I don't think it is pertinent to say what I should do a week from now. It is a special meeting.'

"I know of nothing else in the record that comes nearer than this to supporting an inference that appellant refused to produce the records or expressed unwillingness to produce them."

lant took part in a combined action to withhold records. It has been suggested that she might have asked the Board, or Bryan, to produce the records. But there is no evidence that if she had asked them they would have complied. There is no evidence that the nonproduction of the records in the committeeroom resulted either from anything the appellant did or from anything she omitted to do." 84 U. S. App. D. C. 388, 390, 174 F. 2d 519, 521.

The respondent was summoned to produce papers before a congressional committee and did not produce them. For this non-action she was prosecuted as a person who "willfully makes default" in not producing the papers. I believe in giving penal statutes a scope their words would receive "in everyday speech." *McBoyle* v. *United States,* 283 U. S. 25, 26, and see *Roschen* v. *Ward,* 279 U. S. 337, 339. If language in a criminal statute is to be read with the normal meaning of English speech, "willfully makes default" surely conveys the thought of a substantial tie between the non-production of papers and the non-action to which it is attributed. This record is barren of the proof which under our system of punitive justice would have warranted a jury to find that respondent was actively or passively responsible for the nonproduction of the papers she was asked to produce.

This conclusion does not imply the slightest relaxation of the duty of obedience to the lawful commands of congressional committees in exercising their power of testimonial compulsion. *McGrain* v. *Daugherty,* 273 U. S. 135. But regard for that power does not call for the slightest relaxation of the requirements of our criminal process. A penal statute must not be applied beyond its terms, and the crime defined by it and charged in an indictment must be established by proof beyond a reasonable doubt.

It may well be that the House committee should have asked respondent to try to have convened a meeting of the executive board with a view to asking the custodian of the records to produce them. Such a procedure is suggested by what was done in *Wilson* v. *United States,* 221 U. S. 361, 370–71. Had respondent refused she would have subjected herself to a contempt proceeding for disobedience of a command of the committee. But this is not such a proceeding. As to the offense for which she was prosecuted, I agree with Judge Edgerton that an acquittal should have been directed.