(Nos. 32147, 42148, 32149.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD R. REZEK *et al.*, Plaintiffs in Error.

*Opinion filed November 27, 1951—Rehearing denied Jan. 21, 1952.*

Ralph S. McFarland, of Chicago, (G. A. Buresh, and C. Vernon Thompson, of counsel,) for plaintiffs in error.

Ivan A. Elliott, Attorney General, of Springfield, and John S. Boyle, State's Attorney, of Chicago, (John T. Gallagher, Rudolph L. Janega, Arthur F. Manning, William J. McGah, Jr., and Edmund H. Grant, all of Chicago, of counsel,) for the People.

Mr. Justice Schaefer delivered the opinion of the court:

The defendants, George S. May, Matt E. Niesen and Edward R. Rezek, respectively the president, vice-president and comptroller of the Tam O'Shanter Country Club, a corporation, were adjudged guilty of contempt of court in the criminal court of Cook County on June 7, 1951. As in the companion case of *People* v. *Ryan, ante,* page 486, decided this day, the alleged contumacious conduct of the present defendants consisted of their neglect and refusal to produce certain books and records of the Tam O'Shanter Country Club before the July, 1950, grand jury in response to *subpoenas duces tecum* issued against them. May was fined $1000 and fines of $500 each were imposed against Niesen and Rezek. Separate writs of error sued out of this court by defendants, each involving the same questions, have been consolidated for hearing and opinion.

On July 28, 1950, the State's Attorney filed a verified petition in this cause in the criminal court seeking the issuance of *subpoenas duces tecum* commanding the corporation, the present defendants and another, Harley Mc-Namara, not involved here, to attend before the grand jury forthwith in connection with a certain complaint made against May and to produce the following documents necessary and material to the investigation then in progress:

"(a) All records showing cash receipts of Tam O'Shanter Country Club for period of January 5, 1949, to July 5, 1950. (b) All records showing cash disbursements of Tam O'Shanter Country Club for period of January 5, 1949, to July 5, 1950. (c) All records showing cash receipts received by Tam O'Shanter Country Club for period of January 5, 1949, to July 5, 1950, from operation of coin machines, including slot machines and gambling games. (d) General Ledger of Tam O'Shanter Country Club for period of January 5, 1949, to July 5, 1950. (e) All records showing Accounts Receivables and Accounts Payable of Tam O'Shanter Country Club for period of January 5, 1949, to July 5, 1950. (f) All records showing accounts of each member belonging to Tam O'Shanter Country Club for the last three years."

On the same day Hon. Julius H. Miner, a judge of the circuit court then sitting as chief justice of the criminal court, entered an order directing the issuance of *subpoenas duces tecum,* as requested in the petition, the *subpoenas* were issued, and service was had upon May and Niesen. Rezek was served on July 29, 1950. The documents commanded to be produced were those set forth in the petition and order, except that, following the last item, there appeared an additional clause in the printed form of the *subpoena* reading, "together with all copies, drafts and vouchers relating to said documents, and all other documents, letters and paper writings whatsoever, that can or may afford any information or evidence in said matter."

Although defendants appeared before the grand jury in response to the *subpoenas,* none of them produced any books or records of the country club corporation. Thereafter, on August 3, 1950, Judge Miner, acting upon petitions filed by the foreman of the grand jury, entered a rule on each defendant to show cause why he should not be punished for contempt of court for having failed without cause or excuse to produce before the court and grand

jury the books and records designated in the *subpoenas* served upon them.

Sworn answers were filed by each defendant which were identical in all material respects. Each defendant stated that, after being *subpoenaed,* he carefully searched all rooms in the clubhouse and all other buildings at the Tam O'Shanter Country Club; that he also inquired of the officers and other persons at the country club as to the whereabouts of the books and records set forth in the *subpoena;* that he was unable to find or learn the location of any of the books and records sought; that he has been informed and believes that James Ryan has filed a verified answer in the criminal court in which Ryan stated that he has the sole and exclusive possession of the documents mentioned in the *subpoena* and that no other person has access to, or knowledge as to the location of, these documents, and that he, defendant, was and is, through no fault of his own, unable to bring before the grand jury the books and records designated in the *subpoena.* Each answer also alleged that the petition for the issuance of the *subpoena,* the *subpoena* issued and the service of the *subpoena* were all void. Each answer also invokes the provisions of the State and Federal constitutions prohibiting unreasonable searches and seizures and providing that no person shall be compelled to give evidence against himself.

After eight continuances, commencing on August 24, 1950, Judge Miner, on June 7, 1951, adjudged each defendant guilty of contempt of court. The judgment orders found that each defendant failed, neglected and refused, without cause or excuse, to produce before the grand jury the books and records of the corporation designated in the *subpoenas.* They also found that the books and records sought were necessary and material to the grand jury investigation; that James Ryan, an employee of the corporation, has and had possession of the books and records of the corporation; that each defendant, an officer of the

corporation, had failed, neglected and refused to demand of and obtain from Ryan the books and records of the corporation designated in the *subpoena;* that this neglect, failure and refusal to comply with the *subpoenas* constituted a willful disobedience and defiance of the process of the court, impeded the proceedings of the grand jury and tended to lessen the dignity of the court; that defendant had failed to show cause why he should not be punished for contempt, and that, by reason of his conduct, he was guilty of contempt of the criminal court.

Subsequently, defendants moved to vacate the judgments of contempt, asserting, in addition to the matters set forth in their answers to the rules to show cause, that the judgment orders were void because Judge Miner's term as chief justice of the criminal court had expired on September 3, 1950, his term as judge of the circuit court expired on June 4, 1951, and that, in any event, even as a holdover judge, he had been assigned to the equity side of the circuit court on June 5, 1951. Defendants further asserted that the judgment orders punished them for failing to do an act not required of them by the *subpoenas* or by any order of court. July 19, 1951, Hon. Frank M. Padden, chief justice of the criminal court, denied the motion to vacate the judgments of contempt and these writs of error followed.

The first question requiring consideration is the authority of Judge Miner to enter the challenged judgment orders on June 7, 1951. In entering these orders, Judge Miner was performing the functions of a judge of the criminal court of Cook County. There are no elected judges of that court. Section 26 of article VI of the constitution provides: "The terms of said criminal court of Cook County shall be held by one or more of the judges of the circuit or superior court of Cook County, * * * as may be determined by said judges, or provided by law. Said judges shall be *ex officio* judges of said court." The

judges of the criminal court are designated by the executive committees of the circuit and superior courts, pursuant to their rules. The law is settled that a judge of the circuit or superior court is not authorized to act as a judge of the criminal court until he is assigned to that court. (*People v. Sullivan,* 371 Ill. 264; *People ex rel. Chicago Bar Ass'n v. Feinberg,* 348 Ill. 549.) Similarly, a judge of the circuit or superior court is not a judge of the criminal court after his assignment to that court has terminated.

When these proceedings were initiated in July, 1950, Judge Miner was a judge of the circuit court sitting by assignment as a judge of the criminal court. The term of office of a judge of the circuit court is six years. Elections are held on the first Monday in June at intervals of six years, beginning with the year 1873. (Const., art. VI, secs. 12 and 14.) On Monday, June 4, 1951, an election was held for the office of judge of the circuit courts. Judge Miner was not a candidate for re-election. From this, defendants argue that his term as judge of the circuit court ended on June 4, 1951, and with it his assignment to the criminal court, so that his authority to act in the present proceedings then ceased.

The argument is not persuasive. Section 32 of article VI of the constitution provides: "All officers provided for in this article shall hold their offices until their successors shall be qualified, * * *." A successful candidate for the office of judge of the circuit court is not qualified until the abstracts of the votes are canvassed and he is declared to have been duly elected, (Ill. Rev. Stat. 1949, chap. 46, par. 22-7,) and is commissioned by the Governor. (Const., art. IV, sec. 29.) The term of the office of a judge of the circuit court, not being otherwise fixed, begins and ends on the date of election; but it is equally true that the term of the person holding the office, as distinguished from the term of the office itself, does not

terminate until his successor has qualified. Const., art VI, sec. 32; *People ex rel. Holdom* v. *Sweitzer,* 280 Ill. 436.

But defendants further contend that the constitutional provision as to holdover judges does not apply to circuit and superior court judges assigned to sit in the criminal court of Cook County. The asserted difference between the criminal court of Cook County and all other courts does not exist. Section 32 of article VI applies to all courts without distinction. Its purpose is to prevent a hiatus in judicial office, and that underlying purpose is as applicable to the criminal court of Cook County as to other courts. Following the election of June 4, 1951, Judge Miner continued to hold the office of judge of the circuit court until his successor qualified and the mere fact that his successor had been elected did not terminate his assignment to the criminal court. Being a judge of the circuit court assigned to the criminal court, he remained a judge of the criminal court until his successor was commissioned or until his assignment to the criminal court was sooner terminated pursuant to law.

In the alternative, defendants contend that Judge Miner's assignment to the criminal court terminated on June 5, 1951, as the result of the following order of the executive committee of the circuit court entered that day: "It is Ordered that Hon. Julius H. Miner, Judge of the Circuit Court, be and he is hereby, assigned to hold court in the Circuit Court of Cook County on the fifth day of June, A.D. 1951, for the purpose of hearing the cause entitled and numbered James Wilson Winger ét al., vs. Chicago City Bank and Trust Company, etc., et al., General No. 42 C 1491, and entering therein any order or orders, decree or decrees which he may deem necessary." This order did not purport to terminate Judge Miner's assignment to the criminal court nor did it constitute a general assignment to the circuit court. It merely assigned Judge

Miner to hold court in the circuit court for the purpose of hearing and entering orders in a specific case on a particular day. It emphasizes his continuing status as a judge of the criminal court, for if, as defendants have contended, the election of a successor had terminated his assignment to the criminal court, no reassignment to the circuit court to hear a designated civil case would have been necessary.

The case most closely in point is *United States Life Insurance Co.* v. *Shattuck*, 159 Ill. 610. There, it was held that a judge of the superior court assigned to the criminal court had no authority to enter an order in a cause previously tried before him in the superior court. In that case it does not appear that there was an order of the executive committee of the superior court assigning the judge to the superior court to hear and enter orders in the civil case. The executive committee of the circuit court undoubtedly had the *Shattuck case* in mind in entering its order of June 5, 1951. By that order, the executive committee assured the validity of any orders entered by Judge Miner in the particular civil case without terminating his general assignment and authority to act as a judge of the criminal court. The practical necessities of efficient judicial administration frequently require that judges be assigned to and from the criminal court to wind up unfinished business, to meet abnormal case loads and for like purposes. We are aware of no prohibition, constitutional or statutory, which prevents the bridging of the gap between the two courts by the method complained of in these cases. The executive committee order of June 5, 1951, did not terminate Judge Miner's assignment to the criminal court of Cook County nor did it deprive him of the power and authority to enter the judgment orders against defendants on June 7, 1951.

As a second alternative, defendants contend that Judge Miner had no jurisdiction to enter the judgments because

he was no longer the chief justice of the criminal court and all matters pertaining to the grand jury are within the exclusive jurisdiction of the chief justice of the criminal court. The contention is unsound. The grand jury is an integral part of the criminal court, as distinguished from any particular judge of the court, and any judge of the criminal court has the power to enter judgments against those in contempt of the court through their failure to respond to *subpoenas duces tecum* returnable before the grand jury. See, Ill. Rev. Stat. 1951, chap. 37, par. 166.

This brings us to a consideration of the merits. To obtain a reversal, defendants further contend (1) that the petition for the order directing the issuance of the *subpoenas* and the order itself were both invalid for failure to state the nature of the matter pending before the grand jury and the materiality or relevancy of the books and records demanded; (2) that the *subpoenas* were neither suitably specific nor properly limited in scope and amounted to a violation of the constitutional guaranty against unreasonable searches and seizures; (3) that the enforcement of the *subpoenas* would compel defendants to produce documentary evidence tending to incriminate them in violation of the constitutional prohibition against compulsory self-incrimination; (4) that their answers to the rule to show cause must be taken as true and their answers purged them of contempt, and (5) that they were found guilty of contempt and punished for their failure to perform an act not required by the *subpoenas* nor any order of court,— to demand of and obtain from James Ryan the books and records designated in the *subpoenas*. The contentions concerning the validity of the petitions for the issuance of the *subpoenas* and the privilege against self-incrimination are disposed of by what was said in *People* v. *Ryan, ante,* page 486, decided today, which involved an identical *subpoena.* The contention concerning unreasonable search and seizure

is disposed of by what was said in *People* v. *Allen, ante,* page 508, also decided today, and in *People* v. *Ryan, ante,* page 486.

As pointed out in *People* v. *Ryan, ante,* page 486, a sworn answer to a rule to show cause does not purge contempt unless it states facts which, as a matter of law, are sufficient to excuse conduct otherwise contumacious. We appraise the last issue raised in defendant's answer, therefore, to determine the legal effect of its allegations as a justification for noncompliance with the command of the *subpoena.*

Of course, inability to comply with a *subpoena* is a valid excuse. The inability which excuses, however, must be real. Self-created inability will not suffice; nor will passive inactivity when reasonable effort might secure compliance. "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt." (*Wilson* v. *United States,* 221 U.S. 361.) The doctrine is not new. "Although a paper should be in the legal custody of one man, yet if a *subpoena duces tecum* is served upon another who has the means to produce it, he is bound so to do." *Amey* v. *Long,* 1 Campb. 17, 170 Eng. Reprint, 860.

*United States* v. *Fleischman,* 339 U.S. 349, and *United States* v. *Bryan,* 339 U.S. 323, involve situations similar to that presented in the case at bar. There, members of the executive board of an unincorporated association who did not have personal possession of the records demanded were held in contempt because they had failed to take any steps to bring about compliance with the *subpoena* by the association's employee who had possession of the records. The following extract from *United States* v. *Bryan,* 339 U.S.

323, is singularly appropriate: "Ordinarily, one charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply. A court will not imprison a witness for failure to produce documents which he does not have, unless he is responsible for their unavailability. \* \* \* On the other hand, persons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery. A *subpoena* has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity. We have often iterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned."

Here, the defendants were the responsible officers of a corporation. When its records were *subpoenaed* they disclaimed all knowledge of their whereabouts, save as they pointed to James Ryan, an employee, and alleged their information and belief as to his exclusive possession of the corporate records. Defendants' answers refer only to their "information and belief" as to the contents of Ryan's answer. There is no showing of any effort on the part of these defendants to ascertain the facts as to Ryan's possession, to the extent that those facts were unknown to them, or to take any step whatsoever to bring about production of the books by Ryan. In these circumstances, exculpation is not achieved by inactivity.

The judgments of the criminal court of Cook County are affirmed.

*Judgments affirmed.*