**Carlos MORALES FELICIANO, et al., Plaintiffs,**

v.

**Rafael HERNANDEZ COLON, et al., Defendants.**

Civ. No. 79–4(PG).

United States District Court, D. Puerto Rico.

July 23, 1987.

Harvey B. Nachman, Harry Anduze, Rafael Pérez–Bachs, José Fernández–Seín, Carlos E. Ramos, Santurce, P.R., Carlos García–Gutiérrez, Nora Rodríguez, Ivonne Díaz de Carrera, Legal Assistance Clinic, University of Puerto Rico School of Law, Río Piedras, P.R., for plaintiffs.

Marcos Ramírez, Hato Rey, P.R., Dept. of Justice, Com. of Puerto Rico, San Juan, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

This Court has held that overcrowding is at the center of the many ills which make the conditions of imprisonment in the Commonwealth penal institutions constitutionally unacceptable. Overcrowding inflicts on the plaintiff class subhuman living conditions and is the root for serious deficiencies in other areas of prison life. *Fischer v. Winter*, 564 F.Supp. 281, 298 (N.D.Cal. 1983).

Since *September 5, 1980*,[1] this Court directed defendants to provide each person in

---

1. On September 5, 1980, this Court, after a hearing on a motion for emergency relief, found the penal system of Puerto Rico unconstitutional. The Opinion and Order, which granted relief to

custody of the Administration of Correction (hereinafter the Administration) with a minimum of 35 square feet of living space. This space requirement of 35 square feet was as a *temporary measure* which was to be eventually increased by the Administration to guarantee 70 square feet to each individually celled inmate and 55 square feet of living space to those housed in dormitories.[2]

In recognition of the urgency to comply with the Order of September 5, 1980, particularly as it pertains to the sleeping and living space for each inmate, the parties entered into a Stipulation on September 8, 1986. At the time of the stipulation a motion by plaintiffs seeking contempt penalties against defendants was pending before the Court. Plaintiffs expressly agreed as part of the stipulation[3] to withdraw said motion in exchange for defendants' undertakings of the stipulation upon the Court's approval of the terms of the stipulation. The Court provisionally approved the stipulation on September 26, 1986, in accordance with the recommendation set forth by the Court Monitors[4] in the *First Report of the Court Monitors (Crowding)*, filed on September 10, 1986. This provisional approval of the stipulation was conditioned upon the appropriate notice to the class and a Rule 23(e) Fed.R.Civ.P. hearing by the Court on the fairness of the stipulation. The hearing was held on December 19, 1986. After said hearing, and having duly considered the terms of the stipulation, the recommendations of counsel and court monitors, as well as the objections raised by the prisoners, this Court approved and adopted as order of the Court the stipulation of September 10, 1986. At said time and through

that same order the *First Report of the Court Monitors (Crowding)* was also confirmed in all respects. Once approved by the Court the parties became bound by the terms of the stipulation and obliged themselves to comply with the deadlines set forth therein in the implementation of its provision.

The approved stipulation requires the reduction of crowding throughout the whole penal system in Puerto Rico immediately.

The stipulation fixes the maximum population for the different institutions under the jurisdiction of the Administration, including inmates assigned to cells and dormitories and excluding those assigned to half-way houses and provides that each inmate housed in a dormitory shall be provided with no less than 35 square feet of living and sleeping space after December 31, 1986[5] (Article 1).

The stipulation also provides that as of December 1, 1986, only cells containing more than 70 square feet of floor space may be used as double occupancy cells and ennumerates the cells which may be used to house more than one prisoner (Article 2).

The conditions under which open celling may be maintained are also part of the regulatory provisions of the stipulation. Inmates in the open-celled areas must also be provided with the 35 square feet of living and sleeping space (Article 3).

The Administration is also required to provide at least 35 square feet of living and sleeping space to each inmate housed in a dormitory *commencing January 1, 1987.*

In Article 7 the maximum capacity figures of the institutions is fixed at 55

---

plaintiffs in several areas, directed that the goal of 35 square feet per inmate was to be achieved in stages within six (6) months from the date of the order. *Feliciano v. Barceló,* 497 F.Supp. 14, 41 (1980).

2. Such plans were to be provided within 90 days of the entry of the order.

3. Thru article 10: *Scope of Agreement and Withdrawal of Plaintiffs' Motion Seeking Contempt Penalties,* the parties addressed said terms of the stipulation.

4. On March 20, 1986, the Court entered a finding of continued unconstitutionality concerning the conditions of the penal institutions in Puerto Rico. Thru order entered on same date the Court appointed two monitors under Rule 53, Fed.R.Civ.P. The monitors were appointed to make current assessment with the state of defendants' compliance with the September 5, 1980, order to report on conditions and to prepare remedial orders directed to bring about constitutional conditions throughout the correctional system.

5. With the exception of all cells at Stop 8.

square feet. Article 7 proscribes that after *December 31, 1987,* any inmate housed in a dormitory be provided with less than 55 square feet of living and sleeping space.

The stipulation establishes for each existing institution the maximum population that can be housed in existing dormitory facilities at 35 square feet per inmate and 55 square feet per inmate and requires in general that any cell containing 70 square feet or less be used to house only one inmate. The most important exception to the latter requirement relates to "open celling" through which two inmates may be assigned to what otherwise would be a single occupancy cell under certain conditions.

The stipulation has three basic deadlines:

1. As of November 30, 1986, the State Penitentiary, including the area known as the Intensive Treatment Unit (UTI), was to house no more than 1151 inmates, all of whom would be confined in cells. The inmates in UTI were to be convicted inmates, and no more than one person could be confined to a cell at UTI. The rest of the State Penitentiary could be converted into "open celling" with double cell occupancy, provided that the inmates who were double celled were pre-trial detainees and also provided that certain enumerated conditions were maintained as to their care and custody.

2. As of December 31, 1986, the Administration was to provide 35 square feet of personal living space while observing certain minimum hygienic standards, and each institution was alloted a maximum number of inmates. As renovated or new living quarters became available, the square feet of personal living space to each confined prisoner or pre-trial detainee was to be raised to 50 feet.

3. As of December 31, 1987, the Administration was compelled to provide 55 square feet of living space to each person entrusted to its custody.

The plaintiffs allege that the Administration has failed to comply with the stipulation ever since it went into effect. Plaintiffs further maintain that defendants are in violation of the agreement and in contempt of the Court's order.

In support of their allegations of noncompliance plaintiffs refer to the *Second Report of the Court Monitors,* which is the report on defendants' state of compliance with the provisions of the Court's order on crowding, filed with the Court on February 27, 1987. The report is the product of the court appointed monitors on site inspections of the penal institutions throughout Puerto Rico during the period January 26–30, 1987.

During the course of these inspections and in the discharge of their duties the monitors proceeded to ascertain the compliance of the defendants with the capacity limits abscribed to each institution, as well as the extent of defendants' compliance with the Court's order on crowding based on the stipulation entered into by the parties on September 8, 1986, to which terms the parties were obliged to adhere.

The monitors' reports documented "serious instances of noncompliance with the terms of the stipulation" (Report at p. 4). Such problems include "institutional populations in excess of the stipulated capacities, maldistribution of populations within institutions depriving inmates of 35 square feet of living and sleeping space, and the use of unauthorized areas for housing" (Report at p. 4).

The report concludes that despite the depopulation efforts which have been made by defendants, "compliance problems of varying degrees of significance exist at most institutions under the authority of the Correction Administration" (Report at p. 66).

The report further points that some institutions house inmates in excess of the total capacity set forth in the stipulation [6] (Report at p. 66). At the same time, the monitors adverted that several institutions also house inmates in violation of the stipulation because of a problem of maldistribution of inmates among the various housing units (Report at p. 67).

6. This is especially evident in the State Penitentiary and in Vega Alta.

Based on the situation of noncompliance, as described by the court monitors thru explicit findings in their reports and on plaintiffs' own knowledge of the violations to the stipulation, plaintiffs have moved the Court for a decree of contempt against defendants and for the imposition of sanctions for said failure. In plaintiffs' view, this is the only remedy available to counter the continuous delays and perpetuation of an unconstitutional system.

On May 27, 1987, the Court held a hearing on the matter. The superintendents of several institutions, to wit: 1) Víctor Ruiz Sárraga—Sabana Hoyos; 2) José L. Crespo—Aguadilla; 3) Clemente de Jesús—State Penitentiary; 4) Santos Amaro Félix—Ponce; 5) Efraín Vargas—Vega Alta; were all ordered to appear at the hearing. They were ordered to bring the following: 1) "Libro de Recuentos" (Book of Recounts) from December 31, 1986, to the present; 2) "Informes de Movimientos Diarios" (Daily Movement Reports) from December 31, 1986, to the present; 3) minutes of the treatment and classification committee from December 31, 1986, to the present; 4) the comprehensive, recorded daily institutional count, as well as the recorded daily population diary that divides the population of the institution among the various housing units to which inmates are assigned as ordered by the Court on March 27, 1987, to the present; 5) in case that the preceding were not available, then records, including log books, tally sheets, intake sheets or any other records or documents which show where the inmates, both pre-trial detainees and sentenced prisoners, classified or not classified, were being housed at the institution from December 31, 1986, until present.

The following is a summary of their testimony.

*Vega Alta*

The testimony of Efraín Vargas, Superintendent at Vega Alta Women's Industrial School, the only female institution in Puerto Rico, was the first one received during the hearing. Mr. Vargas testified that since December 1986 until the present the institution has been housing inmates over the allowed capacity every single day. Superintendent Vargas admitted that he has been aware of the Court's order fixing the maximum capacity but stated that the situation is beyond his control. He stated that all orders he has received for admission have been authorized by a Magistrate. He further stated that the situation has been brought up to the attention of the Administrator of Correction and to the Deputy Administrator,[7] but he has been told that if he does not take those prisoners, he shall be held in contempt.

Mr. Vargas stated that good-faith efforts have been made but that it has been practically impossible to comply with the order of the Court.

Mr. Vargas testified that since June and July of 1986 the population started to grow in an unforeseen way.[8]

The testimony revealed other violations of which the Administration had knowledge. For example, convicted inmates and pre-trial detainees were kept in the hospital and in Room B, and also throughout the institution.

Despite of alleged efforts of compliance, the foregoing violations remained unrebutted during the hearing.

*Ponce*

Mr. Santos Amaro Félix, Superintendent at the Ponce District Jail, also testified. His testimony evinced that although the stipulated capacity of the institution is 457, more than 457 have been housed there since December 31, 1986, to May 23, 1987. In fact, the population fluctuates between 500 and 572, and on May 11, 1987, it reached 583.

The testimony also disclosed other specif-

**7.** A staff meeting with the Deputy Administrator in Charge of Penal Institutions, Dr. Miguel Poupart, within the presence of the Administrator and other superintendents, was held where the manner to loosen overcrowding was discussed.

**8.** An example is that the pretrial detainees

ic violations to the stipulation.[9]

*State Penitentiary*

The testimony of Clemente de Jesús, who had served as Superintendent for only three weeks, was also received. Mr. de Jesús stated that he was not aware of the stipulation until May 5, 1987.

The evidence presented disclosed manifest violations to the stipulation. Due to overcrowding and security five inmates were kept in a cell which housed only two.

On May 27, 1987, the population of the institution was of 1,365, in clear violation of the stipulation which fixed its maximum capacity at 1151.

There were also violations concerning the capacity at UTI, where thirty inmates in excess of the stipulation were kept therein and double celled also in contravention to the stipulation.

Also at the State Penitentiary the pretrial detainees and sentenced prisoners are kept together.

The previous superintendent at the State Penitentiary, Mr. José L. Jiménez Quiñones, was also called to testify. During his testimony further violations were established.[10]

*Aguadilla*

Mr. José A. Crespo, who has been Superintendent at Aguadilla since 1976, testified.

The total capacity of this institution is of 128 inmates. On May 25, 1987, there were 148 inmates but 20 were transferred to Guerrero on that day.

The superintendent stated that they had been complying until April, when they were ordered to receive inmates. On May 21, 1987, they received an order from the Administration that they had to move 20 inmates. These twenty were transferred to Guerrero. They will be evaluated and if the medical staff determines that they

should not stay there, then they will be returned, thus, creating an excess over the allowed capacity.

*Sabana Hoyos*

Víctor Ruiz Sárraga, Superintendent at Sabana Hoyos since 1971, also testified. The institution's capacity was fixed at 460 inmates. By May 26, 1987, there were 482.

In this institution the pretrial and sentenced inmates are kept in the same housing unit.

Mr. Ruiz testified that no new facilities have been built to house inmates since 1980. With the testimony of Mr. Víctor Ruiz Sárraga plaintiffs rested their case.

The situation which prevails in the system, as had been described by the court monitors in their report, was substantiated by the testimonies of the superintendents elicited during the hearing.

The Court further finds that the report rendered by the court monitors also presents additional cases of violation to the stipulation. The report discloses that particular individual housing units as opposed to institutions are overpopulated. Among these housing units are the Admission cellblock at Vega Alta (Report, p. 6); several dormitories at Bayamón (Report, p. 12); several dormitories at Guayama (Report p. 22); illegal use of cells at Stop 8 (Report p. 50); certain dormitories at Miramar (Report p. 52); several dormitories at Humacao (Report p. 53); two dormitories at Arecibo (Report p. 60). No evidence was offered by defendants to rebut these findings of open violations to the stipulation.

Moreover, in subsequent filings[11] plaintiffs have submitted further uncontested facts. On July 3, 1987, the State Penitentiary had 424 prisoners in excess of the maximum capacity. Ponce was 35% in excess of capacity. The women's institution

---

which had been in the high 40's had gone up to 95. (See Monitors' Report at p. 9).

**9.** There were inmates at Ponce sleeping on the floor; two or three dormitories were having problems with overcrowding.

**10.** There was absence of bed frames (just mattresses) and sheets at the B–2 cells and modules.

There were mattresses on the floors, and during a visit in January mattresses were missing in some cells.

**11.** See, *Supplemental Motion in support of the imposition of contempt penalties,* filed on July 13, 1987, and *Further Report on Population,* filed on July 14, 1987.

at Vega Alta had, in excess, 36 inmates. Aguadilla was over the rated capacity by 13 inmates, and Arecibo, Sabana Hoyos, Guavate, Limón and La Pica were all in excess of 90% capacity. The situation did not improve and by July 10, 1987, the State Penitentiary had 418 more inmates than it is supposed to have at 35 square feet. The annex UTI housed 55 pre-trial detainees, 62 minimum classification prisoners, 25 unclassified prisoners and 233 medium classified prisoners. This situation reveals that there are 69 maximum classified prisoners out of the 444 in a maximum security prison.

Ponce had 32 inmates above the limit, Vega Alta had 43 in excess, Aguadilla had 4 above the limit, and Sabana Hoyos 16 in excess. The reported facts disclose that at Guayama there were three dormitories over the limit. In Ponce some dormitories are 50% overcrowded and some nearly 100%. Two dormitories at Aguadilla are at 200%. At Vega Alta the "hospitalillo" area is 263% above capacity.

The testimony of Dr. Mercedes Otero de Ramos, the Administrator of Correction, was received during the hearing.

She declared that she proposed and had made a commitment to comply with the terms of the stipulation once it was signed. She was authorized to sign it by the Governor of Puerto Rico.

She admitted the reality of overcrowding in the penal institutions in Puerto Rico. As had been previously raised by written motions, Dr. Otero de Ramos alleged an unforeseen population increase [12] as the cause which has made strict compliance impossible.

Defendants have also maintained that they are under substantial compliance. They aver that the vast majority of penal institutions are in compliance with the September 1986 stipulation.

In view of the evidence before us the Court reaches the following

12. However, although the estimated projections of population increase were 9.1%, defendants were aware by December 31, 1986, that there

*Findings of Fact*

1. Defendants have failed to comply with the terms of the stipulation of September 8, 1986.

2. The constitutional rights of plaintiff class guaranteed to them by the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States have been violated and continue to be violated as a consequence of non-compliance with the terms of the stipulation of September 1986.

3. One of the causes for deterioration of the compliance at the State Penitentiary was the lack of administration capabilities on the part of the superintendent of that institution. This inefficiency resulted in delayed classification of prisoners and delays in transfers of classified prisoners from the State Penitentiary to other institutions.

4. On March 6, 1987, the Administration entered into a contract with the Federal Bureau of Prisons and the United States Marshal's Office permitting the transfer of up to 150 prisoners, including 15 female prisoners, to Bureau of Prisons facilities. [Defendants' *Second Motion in Compliance with Specific Provision of Court Order.*] As of May 28, 1987, only three transfers had been effected pursuant to this agreement.

5. Although the Administrator of Corrections assumed that the growth in prison population would be 9.1% annually when she approved the Crowding Stipulation, the stipulation is not conditioned upon that or any other rate of increase. No efforts were made to apprise the Court of any increase beyond 9.1% when it became apparent that the increase was greater.

6. Alternatives to incarceration for some classes of convicted and pre-trial prisoners are necessary in order for defendants to achieve compliance with the Court's order on crowding. These alternatives include more halfway houses.

7. The defendant Governor of Puerto Rico has been made fully aware of prob-

had been an increase of 17% and no motion was filed.

lems relating to crowding in penal institutions as those problems have occurred and persisted. The Crowding Stipulation, which was the basis of the Court's order, was approved by the Governor and the Secretary of Justice of the Commonwealth of Puerto Rico.

8. By and large, the only efforts that have been made to achieve compliance with the Court's order on crowding have involved the construction of new housing units for prisoners. No coordinated efforts have been made by the Commonwealth to control the flow of prisoners into or out of existing facilities.

## Conclusions of Law

■ In the instant case the Governor, the Administrator of Correction and the individual members of the Parole Board have failed to comply with the Court's orders stemming from the stipulation entered into by the parties and subsequently approved by the Court. The disregard of judicial authority constitutes a contempt of court. The United States district courts have the inherent authority and duty to protect and effectuate their judgments and to punish disobedience of or resistance to their lawful orders and decrees. *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 3 L.Ed.2d 19 (1958).

■ The power of courts to punish for contempt is a necessary and integral part of the independence of the judiciary, and it is absolutely essential to the performance of the duties imposed on them by law. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911). The basic proposition in contempt proceedings is that all orders and judgments of courts must be complied with

---

13. On the other hand, criminal contempt is designed to vindicate the Court's authority, and the relief in criminal contempt is punitive in the manner of any other criminal sentence. *Gompers v. Buck Stove & Range Co., supra*, 221 U.S. at 444, 31 S.Ct. at 499; *G & C Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 40 (1st Cir.1980).

14. On the contrary, in criminal contempt proceedings, defendants are entitled to trial by jury, except for "petty offenses", which are those re-

promptly, *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975).

■ Contempt of a federal court consists in 1) misbehavior by any person in the court's presence or so near thereto as to obstruct the administration of justice; or 2) misbehavior of any of its officers in their official transaction; or 3) disobedience or resistance to a court's lawful writ, process, order, rule, decree or command. 18 U.S.C. § 401. An act or omission in violation of an order of a court may subject a party either to criminal or civil contempt, or both *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

■ Contempt proceedings can be either civil or criminal in nature. The characterization of a proceeding as civil or criminal depends primarily upon the purpose for which a contempt finding is sought and issued. *Gompers v. Buck Stove & Range Co., supra*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797; *Shillitani v. United States*, 384 U.S. 364, 369, 86 S.Ct. 1531, 1534–1535, 16 L.Ed.2d 622 (1966). Civil contempt is remedial in nature and generally designed either to coerce compliance with a court order or to compensate the plaintiff for any losses sustained.[13] *See, United States v. United Mine Workers of America, supra*, 330 U.S. at 303–304, 67 S.Ct. at 701.

■ There is no right to trial by jury in a civil contempt proceeding.[14] *Shillitani v. United States, supra*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622.

■ The proof of the defendant's violations in a civil contempt proceeding must be clear and convincing.[15] *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir.1976).

---

sulting in imprisonment of not more than six months or a fine of not more than $500.00. *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).

15. However, in a criminal contempt proceeding the violation of the order must be proven beyond a reasonable doubt. *Michaelson v. United States*, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162 (1924).

Although willfulness is a necessary element of criminal contempt, it is not of civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949). Furthermore, the absence of willfulness does not relieve a party from civil contempt. Civil, as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses for damages sustained by reason of noncompliance. Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act. *McComb v. Jacksonville Paper Co., supra*, 336 U.S. at 191, 69 S.Ct. at 499.

In the instant case defendants have continously alleged their impossibility to comply due to unforeseen circumstances. They maintain that there has been substantial compliance. It is clear that impossibility or inability to comply with the judicial decree is a valid defense to civil contempt charges. *United States v. Bryan*, 339 U.S. 323, 330–334, 70 S.Ct. 724, 730–732, 94 L.Ed. 884 (1950).

However, the burden of establishing impossibility or inability to comply as a defense to civil contempt is on the party raising the defense. The party petitioning for an adjudication of civil contempt does not have the burden of showing that the respondent has the capacity to comply. *United States v. Rylander*, 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983); *United States v. Fleischman*, 339 U.S. 349, 362–63, 70 S.Ct. 739, 746, 94 L.Ed. 906 (1950); *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

It is established that a party against whom civil contempt sanctions are sought is not held to absolute compliance with the Court's order. If a party has taken all reasonable steps within its power to insure compliance with the orders, that party ought not be held in contempt. *Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union*, 531 F.2d 617, 626 (D.C.Cir.1976); *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir.1976), *cert. denied*, 430 U.S.

931, 97 S.Ct. 1550, 51 L.Ed.2d 774. However, if inability to comply is to serve as a valid defense to civil contempt, it must be demonstrated clearly and categorically. *Powell v. Ward*, 487 F.Supp. 917, 933 (S.D. N.Y.1980), *aff'd as modified*, 643 F.2d 924 (2nd Cir.1981).

[19] The extent of the efforts needed to comply will vary with the circumstances. *In re Westinghouse Elec. Corp. Uranium Contracts Litigation*, 563 F.2d 992, 997 (10th Cir.1977).

In the instant case in spite of defendants' allegations, they have not clearly demonstrated their impossibility to comply. Defendants' arguments are unpersuasive. They represent more of what this Court has heard for years and which is evinced by the history of this lengthy and troublesome litigation. It has been held that defendants violate their obligations under a federal court order and, therefore, are subject to civil contempt sanctions if the order is violated by failures of diligence, effective control and steadfast purpose to effectuate the goals prescribed in the order. *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C.Cir.1975); *Aspira of New York v. Board of Education of City of New York*, 423 F.Supp. 647, 654 (S.D.N. Y.1976).

Assertions of the good faith efforts to comply with the order are irrelevant. Intent is not an issue in civil contempt proceedings. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949). Defendants have failed to comply with the district court's order, *McComb, supra*, at 191, 69 S.Ct. at 499, and they have also failed to present a valid defense for their non-compliance. Budgetary limitations or inadequate resources can never be a valid justification for constitutional violations. *Lareau v. Manson*, 651 F.2d 96, 104 (2nd Cir.1981); *Ahren v. Thomas*, 434 F.Supp. 873, 898 (W.D.Mo.1977).

Such is the situation before us. Furthermore, the fact that efforts and improvement have been made leading to an

increased degree of compliance does not protect a party from contempt where it has not established that further improvements would be impossible. *Fortin v. Commissioner of Mass. Department of Public Welfare,* 692 F.2d 790, 797 (1st Cir.1982). Defendants' burden is a heavy one. *Combs v. Ryan's Coal Co., Inc.,* 785 F.2d 970, 984 (11th Cir.1986).

█ In this respect, no particular percentage of compliance can be used to define the substantiality of a party's compliance. Substantiality depends on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest. *Fortin v. Commissioner, supra,* 692 F.2d 790, 795 (1st Cir.1982) (94% compliance does not constitute substantial compliance where underlying rights vindicated by order are important).

█ Although diligence is relevant to the question of the ability to comply, evidence of diligence alone does not satisfy the burden on a party defending itself against contempt. The fact that efforts and improvements have been made does not prove that further improvement would be impossible. Indeed, the test of impossibility is particularly strict in cases in which the needs of the persons protected by the court's order are urgent. *Fortin v. Commissioner, supra,* at 796–797.

█ The fact that a party did not foresee the difficulty of compliance does not constitute a defense to civil contempt unless that party can establish that it took all reasonable measures to exercise diligence, effective control and steadfast purpose to effectuate the prescribed goals. *Aspira of New York v. Board of Education City of New York, supra,* at 651.

This Court applauds whatever advances have been achieved by the Administration. However, we cannot condone any further the perpetration of constitutional violation in open disregard to the Court's order and to defendants' own compromise to comply. The situation has continued for too long. The waiting time is over.

In view of the foregoing the Court finds that defendants the Governor of Puerto Rico, the Administrator of Correction and the members of the Parole Board of the Commonwealth of Puerto Rico have failed to comply with the orders of the Court and finds them in contempt.

█ The sanction imposed after a finding of civil contempt serves two functions: to coerce future compliance and to remedy past noncompliance. *United States v. United Mine Workers,* 330 U.S. 258, 302–04, 67 S.Ct. 677, 700–701, 91 L.Ed. 884 (1947).

█ In choosing sanctions designed to coerce future compliance, the district judge sitting in equity is vested with wide discretion in fashioning a remedy. *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2nd Cir.1979).

█ In assessing the appropriate character of a remedy, the district court must consider the character and magnitude of the harm threatened and the probable effectiveness of any suggested sanction in bringing about the result desired. *United States v. United Mine Workers, supra,* 330 U.S. at 304, 67 S.Ct. at 701.

█ WHEREFORE, for their past noncompliance with the stipulation and the orders of this Court, it is hereby

ORDERED that the Governor, the Administrator of Correction and the members of the Parole Board of the Commonwealth of Puerto Rico shall pay as sanctions the amount of $50,000.00 for violations to the Court's orders.

The Court FURTHER ORDERS that a daily fine of $10.00 per inmate shall be paid whenever an inmate is held living in an institution where the maximum capacity has been exceeded. The same fine shall be paid whenever a prisoner is held living in a cell, dormitory or any other particular housing unit within an institution in conditions which contravene the terms of the stipulation concerning the required living space.

In the discharge of their functions, the monitors shall report to the Court on a

weekly basis the extent of non-compliance for the purpose of computing any fines.

Any future fines imposed and based on the formula set above shall be paid at the Clerk's Office of this Court before 3:00 P.M. the Friday following the computation.

IT IS SO ORDERED.