Carlos MORALES FELICIANO,
et al., Plaintiffs

v.

Pedro ROSELLOÓ GONZÁLEZ,
et al., Defendants

No. 79–04(PG).

United States District Court,
D. Puerto Rico.

Dec. 20, 2000.

Carlos V. Garcia–Gutierrez, San Juan, PR, Dennisse N. Longo–De–Morgan, Special Asst Atty General, Department of Justice, Office of Attorney General, Manuel A. Rodriguez–Banchs, San Juan, PR, for Plaintiffs.

Rick Nemcik–Cruz, Rio Grande, PR, for Defendants.

## *OPINION & ORDER*

PEREZ–GIMENEZ, District Judge.

### Procedural Background

The long and unfortunate history of this case is well known to the parties and need not be discussed at length here. The immediate issue at bar concerns whether Defendants should be held in contempt for violating Court Orders concerning the usage of admission cells and the filing of a court notice and staffing report for new facilities. A short discussion of how the issue was brought to the Court's attention and some pertinent history follows.

The Court first dealt with overcrowding in the Administration of Correction's insti-

tutions twenty years ago when it issued its preliminary injunction governing prison conditions. *Feliciano v. Barcelo*, 497 F.Supp. 14 (D.P.R.1979). Before that decision was entered, a number of cases had been litigated and settled in this Court and resulted in contempt proceedings for non-compliance: negotiations with plaintiffs' court-appointed counsel averted the sanctions sought for contempt. *Feliciano*, 497 F.Supp. at 16–17, n. 2 . The first hearings in this case resulted in a preliminary injunction ordering relieve of the uncontrolled overcrowding that prevailed in AOC institutions.

In 1986, the court issued an Opinion and Order, *Morales Feliciano v. Romero Barcelo*, 672 F.Supp. 591 (D.P.R.1986), *aff'd* 887 F.2d 1 (1st Cir.1989), in which the court evaluated compliance with the 1980 Preliminary Injunction:

> The Court must regrettably find, however, that the defendants have all too frequently offered the appearance of compliance with its decree as a substitute for obedience, the laws of the Commonwealth have been ignored by administrators (at all levels) who disobey in silence, and vast sums of money, whose expenditure has been repeatedly proffered to the Court as evidence of reformation, have been wasted without bringing about any substantial and enduring change in the reality of daily life in Puerto Rico's prisons. What little has been done, the Court finds, is only the result of the Court's prior intervention . . .

*Morales Feliciano v. Romero Barcelo*, 672 F.Supp. at 594.

As to overcrowding, this Court stated that "[a]s the Court visited each institution the sense of physical closeness and the revulsion at so much compressed humanity grew to an awareness of the psychological stress which must affect any human being almost totally deprived of any privacy or

intimacy." *Morales Feliciano v. Romero Barcelo*, 672 F.Supp. at 597.

In 1986, Plaintiffs filed a motion to hold defendants in contempt for their failure to obey the overcrowding reduction orders in the Preliminary Injunction. Defendants again escaped being held in contempt by entering into a stipulation with Plaintiffs. This stipulation imposed a time limitation on admission cell usage. See *Stipulation* dated September 8, 1986 (further discussed bellow).

By 1990 the detention cells, holding pens, and admission cells were again the subject of controversy [1]. On 22 February 1990, the Court ordered the Court Monitor to recommend maximum capacities for each admission cell not specifically addressed in the 1986 Stipulation. This led to the Court Monitor's 107th Report, which reported the capacities of the then-existing admission cells, detention cells, and holding pens. Relying on the defendants' own capacity estimates, the court monitor set a 16.9 square foot capacity for future cells and pens.

After a change in equitable defendants on January 2, 1993, Plaintiffs again sought to hold Defendants in contempt. With minor modifications, the facts set out by plaintiffs in their contempt motion were stipulated as correct by Defendants in a *Motion to Submit Amendment.* Negotiations ensued which produced, after months of deliberation, the *Revised Stipulation* (Dkt.5094), on which Plaintiffs ground their present requests for fines and compensatory relief.

On January 30, 1998 Plaintiffs filed a *Motion for Order to Show Cause Why Defendants Should Not be Held in Contempt For Holding Inmates in Admission Cells in Violation of the Court's Orders* (Dkt.6759). In that motion Plaintiffs assert that Defendant's violated this Court's orders regarding (1) the maximum amount

---

1. For clarity reasons holding pens, detention cells and admission cells will be collectively referred as admission cells.

of time an inmate may be held in a detention cell, holding pen or admission cell, (2) the maximum number of inmates which may be placed in admissions cells, (3) the immediate notification to the Court on newly created admission cell areas, and (4) the filing of staffing patterns prior to opening new facilities. On April 30, 1998, Defendants responded by filing an opposition to Plaintiffs' motion. (Dkt.6785). On May 15, 1998, Plaintiffs amended their motion (Dkt.6812), and Defendants responded in opposition on July 6, 1998. (Dkt.6858).

The Court issued an order to show cause why Defendant's should not be held in contempt. Evidentiary hearings were held on July 13, 15–17, 21–23 and October 13–15, 1998. After comprehensively considering the extensive amount of documentary and testimonial evidence presented during the hearing, the Court finds as follows.

## I. Findings of Fact

### A. The Court Orders

The September 8, 1986 Stipulation set forth limitations on the use of the Administration of Corrections's (AOC) housing units and facilities. The stipulation provided, in part that

> "Detention cells, holding pens or admission areas shall be used only for temporary detention and transfer purposes. Inmates may be held in any such cell, pen or area for a maximum period of 24 hours, during which time they must be under constant supervision to ensure that their safety and hygienic needs are met".

*Stipulation* dated September 8, 1986 (filed September 10, 1986; Dkt.910). This stipulation was approved by Order dated January 26, 1987 (Dkt.948).

The *Court Monitor's 107th Report Recommending Maximum Capacities for Detention Cells* (Dkt.2122) established maximum capacities for detention cells throughout the correctional system. This Court adopted the report in its May 23, 1990 Order which instructed Defendant's to follow the maximum capacities established in the monitor's report. (Dkt.2236). In case of an emergency, the capacity of admission cells could be exceeded but not for more than eight hours. Defendants were directed to notify the Court "as quickly as possible" if they exceeded the cells capacities for "emergency" reasons. *Id.*

The May 23, 1990 Order reiterated to Defendants that they were not to hold inmates in admission cells for more than 24 hours. In the Court's own words "the aforementioned cells [admission cells] shall be used *only for temporary detention and transfer purposes. Inmates may be held in any such cell for a maximum period of 24 hours* ". Id. (*emphasis added*). Defendants were further charged with the obligation of providing constant supervision of admission cells to assure the inmate's "safety and hygienic needs". *Id.* Defendants were to notify the Court of the location, size and designation of any cell not addressed by the order if that cell was to be used for admissions purposes.

In 1994, Defendants agreed to be subject to automatic fines in the event that they housed inmates in admission cells in violation of the Court's orders. These unappealable fines and the conditions under which they will be imposed, are set forth in paragraph III.B.3 of the parties *Revised Stipulation* (Dkt.5094)[2]. This

---

2. The paragraph reads "3. Detention Cells, Holding Pens, and Admission Cells:

a. In the event that defendant's, after June 30, 1994, house prisoners in a detention cell, holding pen, or admission cell in excess of the capacity established by the Court's prior orders, and this condition continues for more than 8 hours, defendant's will be deemed to be in violation of the capacity provisions af-

fecting such cells or holding areas. If a capacity violation persists for more than twenty-four hours, defendants will pay a fine in the amount of $600 per prisoner, per day, for each subsequent day, or portion thereof, any such violation continues.

For the purpose of this sub-paragraph, a day is defined as each twenty four hour period commencing after the first twenty four

Court further elaborated on the procedure for imposition of such fines in its *Order Finally Approving Stipulations Regarding Security, Staffing, FRP, Classification and Other Matters* (Dkt.5429).

On September 1, 1994 the parties entered into a *Stipulation Regarding Custodial and Sociopenal Staffing* ("Staffing Stipulation") (Dkt.5241). This stipulation specified, at paragraph 44, that "defendants will not open any new facilities, new housing units, or housing units rehabilitated under the Facilities Rehabilitation Program until defendants have filed a staffing pattern for the facility or unit..." The Court approved the stipulation on December 5, 1994 (Dkt.5429) and directed defendants to implement the stipulation's provisions.

## B. Particularity of Admission Cells

Admission cells, holding pens and detention cells must be managed differently from the rest of the correctional facility. Inmates are not expected to remain in intake facilities for prolonged periods of time. Thus, admission cells lack many of the features that make housing units habitable. In general, admission cells lack toilets, beds, bathing or washing facilities, drinking fountains and are usually located in areas where access to programming and recreational facilities is limited or nonexistent.

Admission cells house inmates which are at a particularly susceptible period of their correctional tenure. For starters some of the inmates quartered in these cells come directly from the street. Little is known about these inmates. Correctional officers are ignorant of such things as whether the newly arrived inmates are particularly violent, whether they are in need of any special care or whether they are particularly susceptible to attacks by the rest of the prison population. Not everything is known about the inmate's health before he mixes with other inmates in an admission cell[3]. Overcrowding and prolonged stays in admission cells increases the vulnerability of the overall situation and the spreading of diseases.

It was with this scenario in mind that this Court ordered Defendants to rectify their unconstitutional treatment of inmates locked up in admission cells[4].

## C. Conditions of Confinement in Admission Cells

### Ponce Southern Detention Center

Fase III at the Ponce Southern Detention Center (referred to herein as "Ponce Fase III") has 10 admission cells. These cells are divided between two areas of the

---

hours of any capacity violation. The fines will be calculated on the basis of the highest count of inmates in a cell during any such period.

b. In the event that defendants, after June 30, 1994, house a prisoner in a detention cell, holding pen, or admission cell beyond the length of time permitted by the Court's prior orders, the defendant's will be deemed to be violation of the time limit provision affecting such cells or holding areas. If such a time-limit violation persists for more than 24 hours, defendants will pay a fine in the amount $100 per prisoner for each subsequent hour, or portion thereof, any such violation continues.

The parties recognize that an inmate can be held in an admission cell, holding pen or detention cell at the established capacity for up to twenty four hours. The parties also recognize that, in an emergency, defendants may house more prisoners that the established capacity in such cells, but only up to eight hours. Thus, the period during which the defendant's will be deemed to be in violation of the time limit provision will depend upon whether or not inmates are housed at capacity."

3. For example, health officials can't possibly determine instantly whether an inmate is HIV positive. HIV testing, as well as testing for other infectious diseases, simply takes time.

4. As discussed in the previous section, this Court specifically charged Defendants to observe admission cell capacities, not to house inmates for more than 24 hours in admission cells and to provide inmates with constant supervision to assure their hygienic and security needs.

institution—the corrections area and the medical area [5].

*Prolonged Stays & Overcrowding*

Both testimonial and detailed documentary evidence demonstrate that inmates were held in the Ponce Fase III admission cells far beyond 24 hours. One inmate testified that he was held in an admission cell for *eighteen days*. Another testified as to being held for *twelve days*. Reports from the AOC's "compliance office" [6] state that at one point 105 of the 111 inmates housed in the admissions cell areas at Ponce Fase III had been there for more than 24 hours "without any type of movement" [7]. Pls. Ex. 133, 136. According to these reports two inmates had been there from November 1, 1997 to at least the time when the report was written—November 13, 1997.

The testimonial evidence relating to overcrowding vividly corroborates the documentary evidence. According to inmate testimony some of them were held for *three days in a cell with a capacity of six, in which nine inmates were housed*. Another inmate stated that he was held *approximately twelve days in a cell with a capacity of nine, in which sixteen to twenty-three inmates were housed*. Yet another inmate testified that he had been held in the intake area for *fourteen days in a cell with a capacity of nine*, in which up to fifteen inmates were housed. Back in November of 1997, officers from the compliance office determined that the Ponce admissions area was suffering from "a clear

and punitive overcrowding" [8]. Defendant's failed to provide the Court with any evidence and/or notice to the effect that this overcrowding was compelled by an emergency.

Inmates were often compelled to take turns sleeping, or to sleep sitting up because there was not enough room to lay down. They slept on the floor and were not provided mattresses, blankets or sheets to cover themselves. At times the lack of sleeping space caused altercations among the inmates. Not to mention muscle pain and spasms. Up to at least May of 1998, inmates did not receive any recreation outside their cell during the time they were locked in the admission cells.

*Hygiene*

Cells in the medical area did not have toilets in them until March or April of 1998. All inmates in the medical area, at times more than fifty, used only one toilet located outside the cell. In order to use the toilet, inmates had to rely on an officer to open their cell and escort them to the bathroom. When officers did not acquiesce to their requests for access to the toilet, which apparently happened on a regular basis, inmates urinated inside or just outside the cell.

Memoranda and letters attest to the numerous sanitation and health problems endured by both the inmates and the medical personnel stationed in close quarters with the inmates. Pls. Ex. 55; 64 to 73 One of these letters warns that medical personnel

---

5. Defendants make much of the fact that some cells in the medical area were "waiting areas," for inmates awaiting medical appointments. The Court is convinced that these so called waiting areas were at some point converted into admission cells. They essentially served the same purpose. Any cell used for temporary detention or holding purposes falls within the purview of the order limiting the use of "admission cells, holding pens, or detention cells," regardless of what AOC staff may call those cells. The name of the cell doesn't change its function.

6. "La oficina de cumplimineto" or "office of compliance" was established by AOC to over-

look the institution's compliance with this Court's orders.

7. The phrase "without any type of movement" is a direct translation from what the report actually states—"De los ciento once (111) reclusos, ciento cinco (105) llevan más de veinticuatro (24) horas en las celdas *sin ningún tipo de movimiento*".

8. The report's actual words are "un exceso de veinticuatro (24) más que la capacidad para lo que fueron diseñadas. *Constituyendose éste en un claro y punitivo hacinamiento*".

# 780

themselves were feeling the effects of overcrowding under deplorable sanitary conditions. Pls. Ex. 67. Medical personnel suffered from conjunctivitis, allergies, nausea and other conditions associated with their work environment. At one point, one of the nurses vomited due to the strong stench. Pls Ex. 68. Inmates housed in admission cells suffered the same effects but to a higher degree. The letters further substantiate that cells in the medical area were full of flies.

Testimony reveals that the admissions cells at Ponce III were infested with cockroaches. There was vomit and urine on the floor of the cells. The extent of the roach infestation compelled some inmates to use toilet paper to plug their ears for fear that cockroaches would crawl into their ears.

Prisoners were provided with only one set of clothes which were never laundered. Inmates were not issued so much as a change of underwear. As a result, the admissions cells were permeated by the stench of old clothing, coupled with the smell of urine and vomit. Poor ventilation and high temperatures only worsen the situation.

Inmates who washed their clothes did it in the shower during their bath time. Because inmates were given only one change of clothes, those that washed their clothes either had to wear them wet until they dried, or had to spend time unclothed in crowded cells.

Aside from the small cake of soap provided to inmates for baths, inmates were infrequently provided with toothpaste, toothbrushes, deodorant, razors, toilet paper or other personal hygiene items. They were not provided with towels to dry themselves, and had to dry themselves with their shirts, or share towels.

The admission cells at Ponce III were not cleaned regularly. Some inmates testified that they were not cleaned at all. The Court finds that no program of sanitation was in place to regularly clean the cells.

*Health and Access to Medical Attention and Facilities*

Sick call was denied to or was inadequately available to inmates while in the Ponce admission cells. Guards were not always willing or able to give inmates access to medical facilities. According to testimony, one inmate who had an earache was compelled to cut himself so that a guard would take him to the medical area. It took around twenty minutes for the inmate to receive medical attention.

Perhaps the most serious deficiency in the provision of medical care involves inmates suffering from drug withdrawal following their admission to prison. Drug withdrawal, if not attended to properly causes nausea, vomiting, chills, pains, restlessness, irritability, and anxiety. The record indicates that numerous inmates were denied the necessary medication and suffered through withdrawal on the floor of crowded admission cells. These inmates would vomit inside the cell. They were restless and often kept other inmates awake, increasing tensions. At times, inmates dealt with the lack of adequate care by self-medicating with medicines discarded by other inmates.

Ponce admission cell inmates did not have access to drinking water inside their cells. Instead, inmates had to rely on guards to allow them access to water outside the cell. Sometimes, guards were either unable or unwilling to allow inmates access to drinking water.

The intense overcrowding coupled with unsanitary conditions increases the risk of diseases caused by contact with blood and secretions such as Hepatitis C, Hepatitis B, HIV and Herpes. The Court finds that inmates housed in Ponce III admissions cells were unnecessarily exposed to serious health risks.

*Security*

The configuration of some cells at Ponce's correctional admissions area do

not lend themselves to constant sight and sound surveillance. In order to observe what is occurring inside the cell area a correctional officer would have to be located directly in front of the each of those cells. The Court finds that no officers were stationed permanently or even occasionally in front of those cells.

Only three guards were assigned to supervise 30–60 inmates in the medical admissions area. At some point there was only one guard appointed to the area. This guard had to escort the inmates to the bathroom, give them water, take them to the medical facilities when needed and ensure security for the whole area including the 60 or so inmates and the medical staff.

Letters from Correctional Health personnel to Ponce officials attest to the lack of security measures in the area. Pls. Ex. 64–73. Medical personnel pleaded with Ponce officials for more security because they feared for their safety. Although numerous letters were written, the personnel's prayers went unanswered for at least six months.

Guards assigned to the admissions area were often removed to cover other areas. At one point, the inmates in the medical area opened the gates to their cells and harassed female medical officers.

The lack of guards, an unsafe cell configuration, cell overcrowding, deplorable sanitary conditions, a lack of sleep and inmates who are going through drug withdrawal makes the perfect equation of a volatile, unsecured and very dangerous situation.

**Bayamón Regional Detention Center**

The Bayamón Regional Detention Center ("Bayamón 308"), has four admission cells. The conditions at these cells were similar to those found for Ponce III. A quick summary of the conditions follows.

*Crowding and Duration Violations*

The admissions cells at Bayamón 308 were closed for renovation during much of 1997. Beginning in September 1997, Defendants began overcrowding the admission cells and maintaining inmates there well beyond 24 hours. Inmates testified to the effect that they were held in the admission cells for *44 days, two months, over six months* and *seventy-four days*. This practice was continuous, affected a great number of inmates and persisted at least into mid-July of 1998.

As to cell overcrowding, Defendants continuously housed inmates in excess of the cell's capacity, a practice which continued as of October 1999 [9]. The total capacity of the admission cells at Bayamón is 74 inmates. At times as many as 136 inmates were housed in the admissions area. Inmates testified as to the overcrowding in their cells. *Forty to forty-five in a cell that had a maximum capacity of twenty; forty-five to fifty people in each cell; Thirty to thirty-five in a cell for sixteen; Thirty to thirty-five inmates in the cell; Twenty-five inmates; Fifty-eight.* A report filed by Department of Health—Correctional Program found that at one point cell A with a capacity of 16 housed 25; Cell B with a capacity of 20 housed 40; Cell C capacity of 20 housed 50 and cell D with a capacity of 18 housed 21. Pls. Ex. 55.

As in Ponce III, inmates in Bayamón 308 admission cells were forced to sleep on top of each other, standing up, sitting up, on cement benches, or on windowsills. Some inmates had to tie themselves to the bars of the cell with their belts so that they could sleep standing up without falling. Defendants did not provide beds, linens or pillows to any inmates. Some inmates were provided with filthy pieces of foam rubber. The rest were forced to sleep on the bare floor—which causes

9. During the evidentiary hearing the Court granted leave to plaintiffs to submit further evidence regarding the issue of cell overcrowding and prolonged stays. The record was left open. Subsequently, Plaintiffs submitted numerical evidence demonstrating admission cell overcrowding and prolonged stays during the period of April 23, 1999 to October of 1999.

harm in the form of muscular pain and spasms. The lack of quality rest time causes irritability, anxiety and general malaise, all of which increases agitation among the inmates.

Inmates in the Bayamón 308 admission cells did not have access to drinking water or any amount of recreation. They encountered difficulty when trying to get access to drinking water. Inmates who succeeded in getting the guard's attention filled a bottle of water and brought it back to the cell. Inmates would all drink from the same bottle.

Inmates were deprived access to educational programs, work programs, religious services and the facility's socio-penal staff. Some of the inmates were not able to communicate with their families for more than a month.

It is clear that the extensive number of inmates led to tension between staff and inmates. A small number of guards were assigned to cover the admissions area. Overburdened with requests, staff would ignore inmates' requests to leave the cells to use the toilet or get a drink of water. This infuriated the inmates.

*Hygiene*

The lack of sanitation in the Bayamón 308 detention cells represented a serious problem and a grave threat to the health of the inmates, prison staff, and anyone that visited the area. A report by Correctional Health personnel presents a comprehensive summary of the lack of sanitation in the area and the health problems associated with it. Pls. Ex. 55.

As of May 1998 there were no toilets inside the admission cells at Bayamón. In order to perform bodily functions inmates had to get an officer's attention and be escorted to the bathroom. At times, guards took as long as a whole hour to assist inmates. Often, the officers were either unable or unwilling to allow inmates access to the toilets. Thus, inmates urinated in communal buckets or other containers located inside the cell.

Inmates in the Bayamón admissions area had infrequent access to hygiene items such as soap and toilet paper. Usually there was not enough soap with which to bathe. Inmates shared towels or dried themselves with dirty clothes. They shared razors and the plastic containers used for urination. This practice increases the risk of diseases caused by contact with blood and secretions. Overcrowding further increased the spreading of air born diseases.

As in Ponce III, inmates' clothes were not changed and no laundry services was provided. Inmates washed their clothes by hand in the shower. They wore them wet until they dried.

The admissions area was infested with cockroaches.. The area was filthy, strewn with food remains and human waste, and permeated with the stench of sweat, urine, vomit, smoke. The lack of ventilation and heat of over 95● only made matters worse.

*Access to Medical Attention and Facilities*

AOC staff at Bayamón 308 did not take sufficient measures to ensure that inmates were provided with necessary medical attention. Sometimes, patients waited some twelve hours to see a doctor. Often patients were not taken to the medical area at all. The Court finds that newly arrived inmates did not get timely medical clearance before getting mixed with other inmates in the admissions. This practice increased the risk of disease.

AOC did not provide sufficient bed apace in the medical detoxification area. As a result, many inmates suffered through withdrawal in the bare floor of admission cells. These inmates did not receive the treatments necessary for withdrawal. They experienced nausea, vomiting, chills, pain, restlessness, anxiety and irritability, all of which adversely affects discipline, security and the rest of the inmates in the area.

*Security*

*The Administrator of Corrections*

The admission cells at Bayamón 308 are configured in a way that makes them particularly difficult to supervise. Cells C and D are located directly behind cells B and A, respectively. A heavy mesh screen obstructs the view into the two rear cells. Security officers' view into cells C and D is obstructed by the heavy mesh screens separating cell B from cell C and cell A from cell D, as well as by the inmates located in cells B and A. Additionally, the only area from which cells C and D can be accessed is through a narrow corridor between the cells. The corridor is so narrow that during a disturbance security guards could easily be obstructed from entering the corridor.

Due to the inordinate number of prisoners housed in the admissions area, different categories of inmates were mixed in the same cells. Pre-trial inmates were housed together with sentenced inmates; young adults were mixed with adults; inmates with special protective custody needs, such as former security guards, were not separated from the rest of the admission cell population. As in Ponce III, the admissions area at Bayamón provided the perfect equation for an unsecured and volatile situation.

**D. The Defendants**

Defendants comprise the Governor of Puerto Rico, the Administrator of Corrections, members of the Parole Board and other administrative officers and the Secretary of Health. The Court finds that none of the defendants except for the Administrator of Corrections have direct responsibility for cell overcrowding in the admission cells of Puerto Rico. Thus, all of the Defendants other than the Administrator cannot be held responsible for noncompliance with the Court orders. As to the Administrator of Corrections the Court finds as follows:

In her capacity as an Administrator, Laboy is directly responsible for cell overcrowding. She has authority to control or remedy such condition in Puerto Rico's correctional facilities. The Court finds that Ms. Laboy wantonly ignored or disregarded this Court's Orders. Evidence demonstrates that as early as August 1997, Laboy had knowledge of admission cell overcrowding in violation of this Court's Orders. Nonetheless, Laboy failed to take any timely *active* action to alleviate the situation.

The Court recognizes that the Administrator is endowed with great responsibility. Puerto Rico's correctional system is indeed a very complex system with a plethora of problems. Of course, no human being is capable of making every single minute decision regarding the systems' management. A competent correctional administrator must delegate some of her functions. Nonetheless, this is a weak and unconvincing excuse for housing inmates in virtually inhumane conditions.

The evidence establishes that it was not until February of 1998—after plaintiffs filed their contempt motion—that Ms. Laboy took some meaningful steps to alleviate the situation. Before that time, Ms. Laboy took little or no action to ascertain her obligations under the court's orders, to discover the extent of the violations, or to correct them. All of these facts were easily available to Ms. Laboy. As Puerto Rico's Correctional Administrator, Ms. Laboy is obviously under the obligation to ascertain them.

Laboy's inaction as to Bayamón 308 is an example of her neglect. On or about July of 1997, Administrator Laboy was informed of the problem with overcrowding at Bayamón's admission cells. Although overcrowding represented a serious violation of this Court's Orders Laboy took no action at that time other than to delegate the responsibility for the problem to the Regional Director. Bayamón's Regional Director did not solve the problem.

Nor did the following Regional Director correct the deficiencies. In the face of these failures, Laboy herself should have taken an active role to insure compliance. Instead, she did not inquire as to the duration of the prolonged detentions, to the seriousness of the overcrowding, or the nature of the living conditions in those cells. Notably, Laboy failed to establish or even inquire as to possible solutions to the problem. Her position is that she fully complied with the Court's orders by delegating her responsibility to the Regional Director. The Court disagrees.

Delegation of this type of serious problem cannot function properly without accountability and clear standards and procedures. The Administrator, however, did not cause clear standards and procedures regarding the use of admission cells to be implemented, nor did she inquire into whether they existed. Only now is the Administration of Correction attempting to draft uniform procedures for the use of admission cells, detention cells, and holding pens. As was true back in 1979,

> "[t]he Court cannot, in view of the evidence, and the fact that half-hearted attempts to correct anything have only been made at the eleventh hour, most of them during the hearing, stay its hand or defer to the local authorities."

*Morales Feliciano*, 497 F.Supp. at 19 (footnote omitted)

Laboy herself testified that as a general practice inmates in Puerto Rico regularly sleep in admission cells. She also testified to the effect that holding inmates for up to 48 hours in admission cells is acceptable. Administrator Laboy's own testimony reveals that she is either ignorant as to her obligations under this Court's orders or that she wantonly and willfully disregards them [10]. It is hard to believe that as of October 13, 1998 (the date when the Administrator testified) she still did not comprehend her obligations under the Orders.

Overcrowding and detentions far in excess of 24 hours in admission cells continued as of at least October 1999. This in spite of Defendants' knowledge of the problem and in spite of the fact that Plaintiffs requested that defendants be held in contempt for this situation in January of 1998. The Court is appalled.

## Findings of Law

### A. Contempt

■ "Federal courts are not reduced to issuing injunctions and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Court decrees, whether consented or stipulated to, are subject to continuing supervision and enforcement. "[A] court has an affirmative duty to protect the integrity of its decree. This duty arises where the performance of one party threatens to frustrate the purpose of the decree." *Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 557 (6th Cir.1982), *rev'd on other grounds sub nom. Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (footnote omitted) (discussing cases); *Berger v. Heckler*, 771 F.2d 1556, 1558 (2d Cir.1985).

■ Contempt of a federal court consists in, *inter alia*, "disobedience or resistance to a court's lawful writ, process, order, rule, decree or command." *See* 18 U.S.C. § 401. The United States district courts have the inherent authority and duty to protect and effectuate their judgments and to punish disobedience of or resistance to their lawful orders and decrees. *First Sec. Nat. Bank and Trust v. U.S.*, 382 U.S. 34, 35, 86 S.Ct. 157, 15 L.Ed.2d 28 (1965); *Morales Feliciano v. Hernandez Colon*, 697 F.Supp. 26, (D.P.R. 1987) citing *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 3 L.Ed.2d 19 (1958). The power of courts to punish for contempt is a necessary and integral part of the independence of the judiciary, and it

---

**10.** As noted in the beginning of this Opinion and Order, the Orders of the Court came about as a result of negotiations and stipulations carried out by Plaintiffs and Defendants.

is absolutely essential to the performance of the duties imposed on them by law. Id. This power does not evaporate when the cost of compliance is high. *Fortin v. Comm. of Mass.,* 692 F.2d 790 (1st. Cir. 1982).

 The real purpose of a civil contempt order is purely remedial—to coerce obedience to a decree passed in complainant's favor, or to compensate complainant for loss caused by respondent's disobedience of such decree. *Parker v. U.S.,* 153 F.2d 66, 70 (1st Cir.1946). The measure of the courts's power in civil contempt proceedings is determined by the requirement of full remedial relief. *McComb v. Jacksonville Paper,* 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599 (1949). "If complainant makes a showing that respondent has disobeyed a decree in complainant's favor and that damages have resulted to complainant thereby, complainant is entitled as of right to an order in civil contempt imposing a compensatory fine". *Parker,* 153 F.2d at 70; See also *Union Tool Co. v. Wilson,* 259 U.S. 107, 42 S.Ct. 427, 66 L.Ed. 848 (1922). In civil, as opposed to criminal contempt, the court has no discretion to withhold the appropriate remedial order. Id. In this respect, civil contempt is somewhat analogous to a tort judgment for damages.

 Recognizing that court's have "awesome civil and criminal contempt power" the First Circuit has established a number of principles designed to oversee its deployment. First, when levying contempt sanctions the court must exercise the least possible power suitable to achieve the end proposed. *Spallone v. United States,* 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990), *Project B.A.S.I.C. v. Kemp,* 947 F.2d 11, 15 (1st Cir.1991). Related to this requirement is the principle that where a fine is imposed it must not exceed the actual loss caused by respondent's violation plus complainant's reasonable expenses in bringing the action. *Parker,* 153 F.2d at 71. Second, a complainant must prove civil contempt by "clear and convincing evidence". *Langton v. John-*

*ston,* 928 F.2d 1206, 1220 (1st Cir.1991); *Project B.A.S.I.C,* 947 F.2d at 15. Lastly, civil contempt will lie only where the putative contemnor has violated an order that is clear and unambiguous. *International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), *NBA Properties v. Gold,* 895 F.2d 30, 32 (1st Cir.1990);

The Court is convinced that Defendant blatantly and egregiously violated this Court's clear and unambiguous orders. Throughout the course of the evidentiary hearing, Plaintiff's presented abundant and detailed numerical proof that convincingly establish that the terms of the stipulation were violated. The numerical proof was supported with vivid and often horrific testimony from inmates who were housed in AOC's admission cells.

In an effort to avoid sanctions, Defendant raises two affirmative defenses: substantial compliance and impossibility.

## B. Defendant's Defenses

*Impossibility*

 Defendant claims that she was unable to comply with the court's orders because of (a) increased or massive police raids; (b) the unavailability of beds system-wide because of the Facilities Rehabilitation Program and other reasons; (c) unexpected increases in the number of inmates entering the correctional system; (d) new legislation increasing the sentences for repeat offenders and limiting the eligibility for parole and community release programs; and (e) an increase in the protective custody population, in part due to the AOC's "zero tolerance" policy toward gangs. Defendants contend that these factors made compliance with the orders impossible.

 Impossibility or inability to comply with a judicial decree is a valid defense to civil contempt charges. *United States v. Bryan,* 339 U.S. 323, 330–34, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *United*

*States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983); *Star Financial Services v. Aastar,* 89 F.3d 5, 13 (1st Cir.1996). The burden of establishing impossibility or inability to comply as a defense to civil contempt is on the party raising the defense. *Rylander,* 460 U.S. at 752, 103 S.Ct. 1548. If inability to comply is to serve as a valid defense to civil contempt, it must be demonstrated clearly and categorically. *Morales Feliciano* 697 F.Supp. at 35. Such burden is difficult to meet. *Fortin v. Com'r of Mass. Dept. of Public Welfare,* 692 F.2d 790, 796 (1st Cir.1982); *see also United States v. Fleischman,* 339 U.S. 349, 362–63, 70 S.Ct. 739, 94 L.Ed. 906 (1950). "The test of impossibility may be particularly strict in a case such as this one, in which the needs of applicants are urgent." *Fortin,* 692 F.2d at 797. Here, the needs of the Plaintiffs are definitely "urgent".

The Court holds that Defendant failed to carry her evidentiary burden. The evidence presented by Defendant consisted almost entirely of the testimony of James Garvey, an expert in correctional operations. Mr. Garvey's testimony did not establish how the AOC's failure to adhere to the capacity and duration standards stemmed from the impossibility of compliance. As was true ten years ago in this very case:

> The [Commonwealth] has not shown that causes beyond its control have made it overwhelmingly difficult or anywhere near impossible to [follow the district court's orders]. The Commonwealth has had considerable time to meet its self-imposed [standards] . . . .

*Morales–Feliciano v. Parole,* 887 F.2d 1, 5 (1989).

The reasons proffered for defendant's alleged inability or difficulty in complying with the court's orders, although perhaps facially plausible, are not supported by the facts. Any difficulty in compliance resulting from the AOC's failure to adequately anticipate and plan how it would handle expected growths in the penal population or problems in housing protective custody inmates is of its own making. The same is true for problems relating to building rehabilitation.

Defendant has simply not done enough to comply with the court orders. Her compliance efforts have been sluggish and disorganized although she has certainly had enough time to comply with the orders. If at any time in the five years since the last orders were entered Defendant felt that she would be unable to comply, she should have sought relief from the court. *Star Financial Services, Inc. v. Aastar Mortgage,* 89 F.3d 5, 14 (1st Cir. 1996). At no time has she done so.

*Substantial Compliance*

 A party against whom civil contempt sanctions are sought is not held to absolute compliance with the orders. *Morales Feliciano,* 697 F.Supp. at 35. If a party has taken all reasonable steps within its power to insure compliance with the orders, that party ought not to be held in contempt. Id. citing *Washington Metropolitan v. Amalgamated Transit,* 531 F.2d 617, 621 (D.C.Cir.1976); *Sekaquaptewa v. MacDonald,* 544 F.2d 396, 406 (9th Cir. 1976); See also *Langton v. Johnston,* 928 F.2d 1206, 1220 (1st Cir.1991). Under the theory of substantial compliance, "if a violating party shows that it has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of contempt." *General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir. 1986); *see also Food Lion v. United Food and Commercial Workers International Union,* 103 F.3d 1007, 1017 (D.C.Cir.1997); *Glover v. Johnson,* 934 F.2d 703 (6th Cir. 1991); *Morales Feliciano,* 697 F.Supp. at 35. In the present case there was no "technical or inadvertent violation". Defendant has simply failed to comply.

 That a party has reached the level of "substantial compliance" necessary to shield her from contempt sanctions depends on the circumstances of each case,

# 787

including the nature of the interest at stake and the degree to which non-compliance affects that interest. *Fortin,* 692 F.2d at 795. In the present case, the interest at stake—protecting inmates from cruel and unusual punishment—is of great importance. This makes the consequences of non-compliance very serious. Notwithstanding, at the hearings Defendant presented more of what this court has heard for years throughout the troublesome history of this litigation.

Plaintiffs have demonstrated gross excesses in both capacity and duration. Defendant, on the other hand, failed to establish that she undertook any affirmative efforts to alleviate the problems of overcrowding and prolonged detentions. To make matters worse, virtually nothing was done to rectify the appalling environmental, health and security conditions caused by the overcrowding in those cells until long after Plaintiffs had moved to hold Defendant in contempt. Such behavior further reveals a general institutional apathy towards the spirit and letter of this court's orders. Evidence demonstrates that the problems continued as of October of 1999.

Assertions of good faith efforts to comply are irrelevant. It is well established that intent is not an issue in civil contempt proceedings. *McComb,* 336 U.S. at 191, 69 S.Ct. 497 ("The absence of wilfulness does not relieve from civil contempt"); *Fortin,* 692 F.2d at 796–97 ("Good faith alone is not a defense to civil contempt"). Defendant has failed to comply with the district court's order and has failed to present a valid defense. Thus, *Defendant is in contempt* for violating this courts orders regarding admission cells.

There is no legal impediment to a finding of contempt against administrator Zoe Laboy. As AOC Administrator, she is charged with a duty to monitor the progress of compliance with this Courts orders. The Court finds that the Administrator knew or should have known about the widespread failures to comply with this Courts Orders and that she failed to take the necessary steps to insure compliance.

Additionally, the Court finds that Defendant failed to comply with this Courts' orders regarding notification to the court when opening new facilities and the filing of a staffing report for those facilities. As was the case with court orders regarding admissions cells, these orders were clear and unambiguous. Yet, Defendant ignored the Court's mandates.

Plaintiffs detained in admissions cells suffered serious mental and physical harm. Uncontroverted expert and inmate testimony firmly established that inmates were detained in small areas under obscenely unhygienic and mentally distressing conditions for prolonged periods of time. They were placed at an excessive risk to both their health and security. They were deprived of sleep and suffered muscle pains and spasms. They were unreasonably and unnecessarily exposed to serious and dangerous communicable diseases. They were harmed psychologically by the deplorable incarceration conditions. Inmates were deprived of basic necessities of life. They were stripped of their dignity.

**Wherefore,** the Court holds Defendant *in contempt* for violating this Court's Orders. Although Plaintiffs have suggested that the Court impose a fine equal to that one calculated utilizing the stipulated fines in the *Revised Stipulation,* this Court has previously stated that

> "The court interprets the *Revised Stipulation* as permitting the court, upon a finding of noncompliance, to impose the non-appealable fine agreed to by the parties, to decline to do so, or to impose a coercive fine in a different amount, so long as the amount does not exceed what the stipulation provides for. Any such determination by the court will be final and non-appealable by either party"

(Dkt.5429).

Because the Court feels that imposing the stipulated fines would be excessive [11], the Court opts to impose a different fine than that one stipulated by the parties. Defendant is thus **ORDERED** to deposit with the Court the amount of $10,000,000.00 (TEN MILLION DOLLARS). The Court deems this amount as sufficient to ameliorate the admission cell situation. The fine will be used exclusively to alleviate confinement conditions at Ponce Fase III and Bayamón 308 admission cells.

It is further **ORDERED** that within one hundred and twenty (120) days of the entry of this Opinion and Order Defendant and Plaintiffs shall submit to the Court a joint proposal detailing specifically how to resolve the admission cell situation. This proposal shall discuss possible admission cell construction or reconstruction alternatives including the construction of toilets and sinks within the admission cells; Security needs including cell configuration and the hiring, training and payment to security personnel designated to admission cell areas; Sanitary needs including the hiring of cleaning staff, and the development of program of sanitation to regularly clean the cells (at least once every twenty-four hours) and inmate clothing. The proposal shall include a detailed time-line for development and implementation. It shall include a discussion of any other *pertinent* issues which Defendant or Plaintiffs deem proper for the improvement of the admission cell situation.

It is further **ORDERED** that within sixty (60) days of the entry of this Opinion and Order the Administrator of Corrections will submit a report to the Court, served upon counsel for the parties, informing the Court on the progress or obstacles the proposal is encountering. Plaintiffs are welcomed, but not ordered, to submit comments regarding the proposal at the time the Administrator has been ordered to do so.

The implementation of the proposal is, of course, subject to approval by this Court.

**IT IS SO ORDERED**

---

11. Plaintiffs suggest that the Court impose a fine in the amount of $51,232,100.00 for violations occurring in the period of June 6, 1997 to March 12, 1998. $45,121,100.00 of these fines pertain to duration violations while $6,111,000.00 concern excess capacity violations. These figures were calculated using the formula stipulated by the parties of in the *Revised Stipulation*. (Pls. Ex. 11, 12 and 13).